**MAGNAVOX CO. v. HART & RENO et al.**

**SAME v. ERNEST INGOLD, Inc.**

**SAME v. STROMBERG–CARLSON TELEPHONE MFG. CO. et al.**

**Nos. 7283, 7284.**

Circuit Court of Appeals, Ninth Circuit.

Oct. 29, 1934.

Charles E. Townsend and Wm. A. Loftus, both of San Francisco, Cal., for appellant.

George L. Wilkinson and Howard W. Hodgkins, both of Chicago, Ill., and Charles M. Fryer, of San Francisco, Cal., for appellees Hart & Reno.

John H. Miller and A. W. Boyken, both of San Francisco, Cal., for appellees Ernest Ingold and Stromberg-Carlson.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

Three suits on three patents, brought by the same plaintiff, the appellant herein, against ten defendants, the appellees, are presented to us for consideration on two appeals. Because of the interrelationship of interests and of subject-matter, we are passing upon both appeals jointly.

All three actions involve alleged infringement of the appellant's patents, which in terms cover telephone electrodynamic and amplifying receivers, but which the appellant asserts apply to "the so-called 'loudspeakers' commonly used in public address work and in connection with radio receiving sets."

In each suit, the prayer was for an injunction and an accounting. The two suits in appeal No. 7284 were consolidated and tried as one in the court below. The hearings in all three actions were partly on depositions and partly on testimony given in open court.

The defenses in each case were invalidity and noninfringement. A memorandum and order was filed by the court below in each action. The memorandums filed in the two cases embraced in appeal No. 7284 are identical in language, and disclose the views entertained by the District Judge as to the entire litigation. The text of those memorandums is in part as follows: "* * * I find it unnecessary to pass upon the validity of the patents, limited as their interpretation must be by the state of the prior art. And after careful study of the patents, the prior art, the law, and the facts, I have reached the conclusion that there is no infringement * * * and so find. The complaints will be dismissed with costs to defendants."

Decrees were entered accordingly, and therefrom the present appeals are being prosecuted.

Each appeal involves two patents. One patent, No. 1,448,279, is common to both appeals. The other patent in appeal No. 7283 is No. 1,579,392, which was also sued on in the cases embraced by appeal No. 7284, but was withdrawn from suit prior to the trial. The other patent that is still the subject of appeal No. 7284 is No. 1,266,988.

In appeal No. 7283, the device alleged to infringe is the "Stewart-Warner Dynamic Reproducer." In appeal No. 7284, the devices complained of are the "Stromberg-Carlson Electro-Dynamic Speaker," and the "Atwater Kent Type F-4 Radio Speaker." The three alleged infringing machines are "substantially of the same construction and mode of operation."

Because of the interrelation of subject-matter, we will arrange our discussion herein, not according to appeals, but according to patents.

Before proceeding to a detailed examination of the facts and the law governing each of the patents, we will make certain preliminary observations applicable to all three.

In the first place, it is well established that the burden of proving infringement rests upon him who alleges it.

Second, the patents in suit all cover "combinations," or, at best, alleged improvements of a minor character. Whether or not these combinations or asserted improvements constitute invention we are not here deciding; for we prefer to adopt our procedure in Lektophone Corporation v. Rola Co., 34 F.(2d) 764, 773, affirmed in 282 U. S. 168, 51 S. Ct. 93, 75 L. Ed. 274, which was followed by the

court below in the instant case, and confine our decision to the question of infringement.

Assuming, then, but not deciding, that the patents in suit are valid, the invention, if any, therein disclosed is of so limited a nature as to require a strict construction of the various claims relied upon by the appellants. We do not believe that the patents, even if valid, are of "pioneer" or "primary" character. As the appellant seems to admit with respect to one patent at least, No. 1,448,279, the invention herein consists "of a combination of old elements," and the claim thereunder is "relatively narrow."

Such a situation calls for a strict construction of the patents. The rule was succinctly stated by Mr. Chief Justice Taft in Eibel Process Co. v. Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 328, 67 L. Ed. 523, cited by the appellant itself: "In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the border line between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in *approximate copies* of the new device. * * * But a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment." (Italics our own.)

Again, in Paper Bag Patent Case (Continental Paper Bag Co. v. Eastern Paper Bag Co.), 210 U. S. 405, 414, 28 S. Ct. 748, 749, 52 L. Ed. 1122, we find the following language: "The right view is expressed in Miller v. Eagle Mfg. Co., 151 U. S. 186, 207, 14 S. Ct. 310, 38 L. Ed. 121, as follows: 'The range of equivalents depends upon the extent and nature of the invention. If the invention is broad or primary in its character, the range of equivalents will be correspondingly broad, under the liberal construction which the courts give to such inventions.'"

See, also, Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 24, 23 S. Ct. 521, 47 L. Ed. 689.

This court repeatedly has followed the above rule. In Thomas Day Co. v. Doble Laboratories (C. C. A.) 42 F.(2d) 6, 8, certiorari denied, 282 U. S. 833, 51 S. Ct. 87, 75 L. Ed. 779, the late Judge Dietrich said:

"However, it is clear, we think, the inventions are not to be classed as in any sense basic or generic, but merely constitute a short step in the advancement of the art. The novelty, such as there is, consists, not in a general conception of the possibility of some combination of the well-known elements, but of a specific concrete combination thereof. Hence, while the monopoly granted by the patent is not to be limited to the identical devices exhibited in the drawings or prescribed in the specifications, *the range of equivalents is necessarily narrow.* Under that view of the case we are of the opinion the defendant's heating device does not infringe." (Italics our own.)

Other decisions by this court to the same effect are to be found in the following cases: Eaid v. Twohy Bros. Co., 230 F. 444, 447; Wilson & Willard Mfg. Co. v. Union Tool Co., 249 F. 729, 731, certiorari denied, 248 U. S. 559, 39 S. Ct. 6, 63 L. Ed. 421; Pacific States Electric Co. v. Wright, 277 F. 756, 758; Overlin v. Dallas Machine & Locomotive Works, 297 F. 7, 12; International Harvester Co. v. Killefer Mfg. Co., 67 F.(2d) 54, 62.

Accordingly, our way charted by the foregoing decisions, we turn to consider the individual patents in suit. And in this consideration we will bear in mind the language of Judge Dietrich in Thomas Day Co. v. Doble Laboratories, supra: "But a detailed description is not thought to be necessary, for we are concerned with points of difference rather than of resemblance."

### Patent No. 1,266,988.

Only claim 8 of this patent is in suit. That claim reads as follows: "8. In a receiver for telephony the combination with a sound box and its diaphragm, of a magnetic field, a vibrating conducting coil for the telephonic currents disposed in said field, and rigidly secured to the diaphragm and connections between said coil and the operating circuit comprising thin metallic strips secured to the diaphragm."

It is to the manner of arranging the lead-out wires of the moving coil so as to eliminate breakage or failure of the instrument, that claim 8 is directed.

This patent is known as the "flat coil" patent. Except for the feature of claim 8, it admittedly represents an obsolete type of instrument.

A horseshoe magnet is provided with pole tips spaced a slight distance apart, to receive a flat or wedge-shaped coil. This coil is fastened rigidly to a sound-producing dia-

phragm. The magnet is energized by field coils so as to create a magnetic flux in the gap occupied by the flat coil. When telephonic or voice currents pass through the coil they cut the lines of force in the gap, and thus vibrate the coil and its attached diaphragm so as to produce audible sounds in an amplified form.

Thin metallic strips that lead to the coil are carried along one face of the diaphragm, being, in the language of the specifications, "glued to the diaphragm with shellac or other suitable substance." They thus move and vibrate with the coil and diaphragm. According to the specifications, "the movement of the diaphragm at or near its periphery is obviously slight and therefore by fastening the conducting strips to the diaphragm at this point, there will be a minimum of bending action on the strips, with a consequent lessening of the danger of breakage."

It is admitted in the appellant's opening brief that the gist of claim 8 resides in the manner of arranging these *thin metallic strips*, although counsel also refer to them as "wires." Not only the claim but also the specifications and the drawings, however, clearly and repeatedly set forth *strips*; and we believe that the claim should be limited thereto.

Edwin S. Pridham, one of the two original patentees of the appellant's amplifying receiver, thus stated the "dominant feature" of the combination involved in claim 8: "The prime requisite, as I said before, is to be able to attach the fine wire of the movable coil to the leads which will not break when they are vibrated. In the combination there is this, if I may state it: The connections between the coil and the operating circuit comprising thin metallic strips secured to the diaphragm in this regard, that the wire of the moving coil is attached to the diaphragm and also these thin metallic conduction strips are attached to the diaphragm."

In the first place, the use of metal strips for electrical connections similar to those here involved is old in the art.

In the British patent to Thomas Alva Edison, 1877, No. 2909, we find the teaching that "in all instances the telegraphic circuit at the diaphragm is made by a thin strip of platina or similar material extending to the center from the line or battery connection."

The United States patent of James Harris Rogers, 1884, No. 297,168, discloses "strips of metal foil d d * * * interposed between the standards and diaphragm, and [extending] in opposite directions to the edges of the diaphragm."

In United States patent No. 521,220, of 1894, issued to W. L. Richards, there is reference to the effect that "any metal strip or ribbon $x^2$ extending from the metal clamping plate p to the frame may be used to establish the front electrode connection."

H. E. Shreeve, in his United States patent No. 602,174, of 1898, teaches as follows: "The dampening-spring $d^2$ is attached to a binding-post v at the upper edge of the face plate, and to a corresponding screw-post y at its lower edge is fastened a ribbon or strip of metal foil or a similar light conductor r, whose other end is bound between the shoulder or washer h and the diaphragm. This serves to secure a good circuit connection between the circuit-conductor $L^2$ and the front contact-electrode e. * * * "

The appellant seeks to minimize the effect of these disclosures by asserting that the foregoing patents all show transmitters of the carbon granule type, with no moving coil in a magnetic field. The appellant therefore argues that their teachings cannot be "used as anticipations."

It is not as anticipations, however, that the above-mentioned patents are here referred to; but as disclosures narrowing the scope of the claim in suit.

And the scope of the claim is important, in view of the fact that the alleged infringing devices admittedly *do not show narrow strips*. Consequently, the doctrine of mechanical equivalents, as we shall presently see, can have no application.

Some light upon counsel's own view as to the breadth of the claim in suit, and also upon counsel's position as to the alleged infringement, is shed by the following paragraph in the appellant's brief: "While not essential in all cases, the feature of extending the lead-out wires from the voice coil along the surface of the diaphragm, is an extremely desirable provision, since it eliminates danger of breakage of the fine wires as set forth in the first patent in suit. In the devices charged to infringe, these lead-out wires are carried from the voice coil along the surface of the conical diaphragm to a point intermediate to the apex and the base thereof, for the purpose of preventing breakage."

As we have already pointed out, although counsel refer to the Magnavox "lead-outs" as "wires," the patent throughout designates them as "strips."

The appellees, however, use *round* telephone wire connections. While conceding, however, that the appellees use "very fine

wires," the appellant assumes that such wires are, in effect, "strips," and that "to substitute thin round strips for thin flat strips in a particular combination, does not avoid infringement."

In other words, the question narrows down to whether or not the "very fine wires" admittedly used by the appellees are in reality "thin metallic *strips*."

In popular usage, the term "strip" denotes a long, *flat*, and narrow piece, as contradistinguished from a long thin cylinder, like a wire.

This is also true in the metallurgical sense, in which the term "strip" is used in the patent in suit. On page 1143 of part 1, volume IX of the Oxford Dictionary, we find the following metallurgical definitions of the word:

"a. An ingot prepared for rolling into plates.

"b. A narrow flat bar of iron or steel; hence iron or steel in strips (more fully strip iron, steel)."

The Supreme Court has passed upon a point closely akin to the one at bar. In Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 277, 278, 24 L. Ed. 344, the following language and italicization were used:

"Then, describing the various parts of the truss in its improved construction, in speaking of the bottom chords (which are those in question) the patentees say: 'The bases of the posts, A, are connected at their bases longitudinally by the lower chords, D, of which four may be placed parallel to each other, on each side of each panel. They are made of *thin bars of rolled iron*, of sufficient depth, and *placed on edge*, so as to support the roadway, and are attached to the bases of the posts by the connecting pins, N, which pass through the hole or eye near the end of these bars.' Again, in summing up, the patentees say: 'The lower chords, D, consist of *wide, thin* rolled iron bars, with enlarged ends, which are made by upsetting the rolled bars by compressing them into the desired shape in moulds into which the heated iron is forced under immense pressure.' * * * The claims are then set forth categorically in the usual manner, the third claim (the one in question) being in these words: '3d. The use for the lower chords of truss frames of *wide and thin* rolled bars with enlarged ends, formed by upsetting the iron, when heated, by compression into moulds of the required shape, for the purpose of increasing the density, toughness, and strength of the eye of the rod. * * *'

"Here, again, the patentees clearly confine themselves to *'wide and thin'* bars. * * * It is plain, therefore, that the defendant company, which does not make said bars at all, but round or cylindrical bars, does not infringe this claim of the patent."

Hence, if "wide and thin bars," capable of being "placed on edge"—that is to say, *flat* bars—are not the same as "round or cylindrical bars," it would seem to follow that "very fine wires," round in shape, do not infringe upon a combination patent calling for "thin metallic strips."

The same Keystone Bridge Co. Case, supra, is a leading authority for the construction that is generally given to patent claims. In that case, the court said, at pages 278, 279 of 95 U. S., 24 L. Ed. 344: "When a claim is so explicit, the courts cannot alter or enlarge it. If the patentees have not claimed the whole of their invention, and the omission has been the result of inadvertence, they should have sought to correct the error by a surrender of their patent and an application for a reissue. They cannot expect the courts to wade through the history of the art, and spell out what they might have claimed, but have not claimed. Since the act of 1836, the patent laws require that an applicant for a patent shall not only, by a specification in writing, fully explain his invention, but that he 'shall particularly specify and point out the part, improvement, or combination which he claims as his own invention or discovery.' This provision was inserted in the law for the purpose of relieving the courts from the duty of ascertaining the exact invention of the patentee by inference and conjecture, derived from a laborious examination of previous inventions, and a comparison thereof with that claimed by him. This duty is now cast upon the Patent Office. There his claim is, or is supposed to be, examined, scrutinized, limited, and made to conform to what he is entitled to. If the office refuses to allow him all that he asks, he has an appeal. But the courts have no right to enlarge a patent beyond the scope of its claim as allowed by the Patent Office, or the appellate tribunal to which contested applications are referred. When the terms of a claim in a patent are clear and distinct (as they always should be), the patentee, in a suit brought upon the patent, is bound by it. Merrill v. Yeomans, 94 U. S. 568 [24 L. Ed. 235]. He can claim nothing beyond it. But the defendant may at all times, under proper pleadings, resort to prior use and the general history of the art to assail the validity of a patent or to restrain its construction.

The door is then opened to the plaintiff to resort to the same kind of evidence in rebuttal; but he can never go beyond his claim. As patents are procured ex parte, the public is not bound by them, but the patentees are. And the latter cannot show that their invention is broader than the terms of their claim; or, if broader, they must be held to have surrendered the surplus to the public."

In picturesque language, the same doctrine is thus expounded in White v. Dunbar, 119 U. S. 47, 51, 52, 7 S. Ct. 72, 74, 30 L. Ed. 303: "Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further. [Cases cited.]"

See, also, Lehigh Valley Railroad Co. v. Mellon, 104 U. S. 112, 118, 26 L. Ed. 639; Yale Lock Mfg. Co. v. Greenleaf, 117 U. S. 554, 559, 6 S. Ct. 846, 29 L. Ed. 952; Hendy v. Miners' Iron Works, 127 U. S. 370, 375, 376, 8 S. Ct. 1275, 32 L. Ed. 207; Howe Machine Co. v. National Needle Co., 134 U. S. 388, 394, 10 S. Ct. 570, 33 L. Ed. 963; McClain v. Ortmayer, 141 U. S. 419, 423–425, 12 S. Ct. 76, 77, 35 L. Ed. 800; Coupe v. Royer, 155 U. S. 565, 576, 577, 15 S. Ct. 199, 39 L. Ed. 263; McCarty v. Lehigh Valley Railroad Co., 160 U. S. 110, 116, 16 S. Ct. 240, 40 L. Ed. 358; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 510, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; Minerals Separation v. Butte, etc., Min'g Co., 250 U. S. 336, 347, 348, 39 S. Ct. 496, 63 L. Ed. 1019; Permutit Co. v. Graver Corp., 284 U. S. 52, 57, 60, 52 S. Ct. 53, 76 L. Ed. 163; Hardison v. Brinkman (C. C. A. 9) 156 F. 962, 967.

In addition to the difference between the fine round wires used in the alleged infringing devices and the thin metallic strips of claim 8, the appellees point out two other differences. In the patent in suit, the specifications set forth, the drawings show, and counsel agree, that the conducting or vibrating coil is "wedge-shaped." The appellees assert that this difference in shape from the coil contained in their devices of itself furnishes an argument against infringement.

Again, it will be remembered that claim 8 calls for a "sound box." As we shall see when we study the other patents, the appellees' devices do not contain sound boxes or any equivalent thereof. The effect of this lack upon the question of infringement will be discussed fully hereafter.

So far as the patent now under consideration is concerned, we hold that, in a claim of so narrow a character, the differences between the appellant's device and the appellees' structures are sufficient to negative infringement.

As was said by Judge Gilbert in Hardison v. Brinkman, supra: "A mechanical equivalent which may be substituted for an omitted mechanical element in a combination claim is one that performs the same function by applying the same force to the same object through the same means and mode of application. In a combination patent for an improvement in the arrangement or adaptation of old elements, the inventor is not entitled to a broad interpretation of the doctrine of mechanical equivalents, so as to cover a device not specifically included in his claims and specifications."

### Patents Nos. 1,448,279 and 1,579,392.

In appeal No. 7283, claims 4, 8, 9, and 10 of No. 1,448,279, and claim 4 of No. 1,579,392, are charged to be infringed.

In appeal No. 7284, only claim 8 of No. 1,448,279 is involved. As we have already pointed out, No. 1,579,392 no longer figures in appeal No. 7284. The other patent that is still involved in appeal No. 7284 is No. 1,266,988, which we have already considered.

Claims 4, 8, 9, and 10 of patent No. 1,448,279 read as follows:

"4. In a telephone receiver of the moving coil type, a magnetizing structure, a receiver head or operating structure adapted to be placed upon or removed from said magnetizing structure as a unit, said receiver head comprising a circumferential pole piece, a sound box supported upon said circumferential pole piece, a diaphragm on the sound box, a coil on the diaphragm extending into a central opening formed in the circumferential pole piece, said coil being surrounded by said circumferential pole piece, a spacing ring

mounted upon said pole piece, and an inner pole held in position by said spacing ring and extending within but free from said annular coil, said receiver head and said magnetizing structure adapted to fit together to form a working magnetic circuit for the purposes as set forth."

"8. An electro-dynamic receiver comprising a shell or casing having bottom and side walls formed of magnetizable material, a magnetizing coil within said casing, a core for the coil extending from the bottom of the casing to the top thereof and formed at its upper end with an inner pole piece, an outer pole piece in the form of a flat plate arranged upon the casing and having a central opening surrounding the inner pole piece and spaced evenly therefrom, means within the casing for retaining said pole pieces, in spaced relation, a sound box carried by the casing, said sound box including a diaphragm and a movable coil rigidly connected to the diaphragm and arranged within the space between the two pole pieces."

"9. An electro-dynamic receiver comprising a base of insulating material, a shell or casing having bottom and side walls of magnetizable material arranged upon the base, a magnetizing coil within the casing, a core for said coil contacting with the bottom of the casing and extending to the top thereof and formed at its upper end with an inner pole piece, an outer pole piece formed with a flat plate arranged upon the casing and having an opening surrounding the inner pole piece and spaced evenly therefrom, means within the casing for retaining said pole pieces in spaced relation, a sound box carried by the casing, said sound box including a diaphragm and a movable coil rigidly connected to the diaphragm and arranged within the space between the two pole pieces."

"10. An electro-dynamic receiver comprising a shell or casing having bottom and side walls formed of magnetizable material, a magnetizing coil within the casing, a core for said coil having contact at its lower end with the bottom of the casing, an extension on the upper end of the core forming an inner pole piece, an outer pole piece in the form of a plate removably mounted on the casing, said outer pole piece having an opening spaced circumferentially from the inner pole piece, means within the casing for retaining the pole pieces in spaced relation, a sound box arranged upon the outer pole piece and supported thereon, said sound box including a diaphragm and an annular coil rigidly connected to the diaphragm and arranged within the space between the two pole pieces."

Claim 4 of patent No. 1,579,392 follows: "4. An article of manufacture comprising an electromagnetic structure including a cylinder, an axial pole piece within the cylinder, a magnetic coil wound upon the pole piece and seated upon the bottom of the casing, a receiver head assembly detachably fitted upon said cylinder and comprising a circumferential pole piece forming a cover plate for the cylinder, a sound box mounted upon the circumferential pole piece, a movable coil fixed to the diaphragm of the sound box and arranged concentrically between the two pole pieces, and a spacing disc arranged between the axial pole piece and the cylinder and located above the magnetic coil to position said pole piece concentrically therewith."

Referring to No. 1,448,279, Pridham said: "In this patent we described and disclosed a means for making a commercial telephone loud speaker which embodies the use of magnetic casing, a core within the casing, a circumferential pole piece mounted upon the casing and a spacing ring within the casing for maintaining concentricity of the air gap."

As to patent No. 1,579,392, Pridham explained: "[Here] is shown a mechanical development of these loud speakers and consists of means of holding the central core and the top plate in alignment with the central pole."

Pridham then dilated upon the alleged merits of the spacing devices disclosed in both patents. These devices, as we will show at the proper time, are admittedly the gist of whatever invention is disclosed by either patent. Pridham said: "The advantage or purpose in providing these spacing devices referred to in connection with loud speakers or telephone receivers in instruments of the moving coil type, is that the coil moves in an air gap which necessarily must be restricted in width in order to use a minimum amount of current to energize the magnetic field. The coil itself must of course have certain minimum dimensions and it must be particularly free to move in this exceedingly narrow air gap. In loud speakers of this type it is not unusual for the coil to move a maximum of one-quarter of an inch in reproducing the low bass notes. Now, if the air gap is not perfectly concentric with the moving coil, or if the air gap can change its conformity in any way it is immediately seen that there is great danger of the moving coil either rubbing in the pole pieces or being crushed by the constant shifting of the pole pieces in shipment.

Therefore it is absolutely essential to keep this narrow air gap in exact form. The clearance, the general clearance, in practically all moving coil instruments is around two or three thousandths of an inch; that is, the distance from the moving coil to either the inside pole piece or the outside pole piece is about the thickness of a sheet of paper. Now, the movement of this coil is, at a maximum, one-quarter of an inch, or two hundred and fifty thousandths of an inch, while the clearance is only two or three thousandths. Thus it can be seen that it is exceedingly important that these pole pieces be fixed in relation to each other and that is the reason that the spacing disc or plate is used in the Magnavox instruments."

It is observable that nowhere in the two patents do we find the terms "wireless telephony," "radio," "horn," "loud speaker," or "broadcasting," or any reference thereto; nor is there any specific mention of radio broadcasting.

Counsel, however, reply that "certainly the structure shown, described, and claimed constitutes a loud speaker and was manufactured and sold in large quantities for that very purpose"; and that "any school boy knows that no matter how the voice currents are transmitted, whether by air or by wire, they are the same when they enter the moving coil of the loud speaker."

On this point, we find in Pridham's deposition the following statement: "There is absolutely no difference in a telephone receiver and a so-called loud speaker for radio broadcast reception in the instrument itself, whether it is used for broadcast reception or telephone reception."

But, even if we grant to the appellant its contention that its device pertains to the loudspeaker and radio art, it next becomes necessary to inquire whether or not the appellant's alleged invention in that art is of a pioneer, primary, or generic nature. If so, it is, as we have already seen, entitled to liberal treatment in the matter of mechanical equivalents; otherwise not.

The appellant's own contentions with respect to the place in the art occupied by its device are not entirely consistent.

On the one hand, counsel intimate that, as a result of Pridham and Jensen's invention, "a new industry has been created and the public has been given something of value which it never had before." The appellant also quotes from the American Stainless Steel Co. v. Ludlum Steel Co. (C. C. A. 2) 290 F. 103, 105, 106, in which reference is made to a "pioneer" patent. In another of appellant's briefs, we find the outright statement that "we are here dealing with patents which created a new industry." And in still another of appellant's briefs we are told that "prior to Pridham and Jensen's inventions there was not on the market nor available to the public, any kind of dynamic speaker," and that "Marconi did no more for radio or wireless transmission and reception than did Pridham and Jensen for loud speakers."

On the other hand, counsel elsewhere say that any contention that the appellant "is seeking to monopolize the radio broadcasting industry" is "ridiculous," and that all the appellant asks for, so far as patent No. 1,448,-279 is concerned, is what is fairly included "within the scope of this relatively narrow claim." Again, counsel assert that "the facts in this case require the application of the rule laid down in Imhaeuser v. Buerk, 101 U. S. 647, 25 L. Ed. 945, to the effect that where the patented invention consists of a combination of old elements, it is entitled to cover equivalents for those elements in the same combination."

It is possible that these contradictions in the briefs reflect the weakness of the appellant's position. Be that as it may, we must look elsewhere for an answer to the question of whether or not the patents in suit disclose pioneer invention.

Considerable light is thrown upon the problem by the candid testimony of Pridham, who, besides being one of the coinventors of the appellant's device, was formerly connected with the appellant and, at the time of trial, was connected with the appellant's predecessor, the Commercial Wireless & Development Company. Pridham testified:

"Q. Why didn't you do as defendant suggests here, take a part from this patent and another part from the other patent, and modify it in relation to a third patent, and then you could have saved yourself all this experimentation and effort? A. I think that is just about what we did do finally. That is the invention we made, taking these different parts from one and from another and putting them together and forming a workable instrument. There is nothing new under the sun; every invention consists of old parts and new combinations."

The two patents we are now discussing were applied for on April 28, 1920, and March 20, 1922. Yet Pridham testified:

"Q. Mr. Pridham, prior to 1915, did you not know that loudspeakers were being used quite extensively, or at least in a number of cities, for the purpose of rendering audible to large audiences, or in large places, the voice of a speaker? A. I heard several such loudspeakers operate in stations, and in the Morrison Hotel, in Chicago. They were the magnetic type, with a short horn. I heard a number of them, yes.

"Q. That was prior to 1915, wasn't it? A. Yes, indeed."

This, it seems to us, is a far cry from "creating a new industry"! The appellees argue from the foregoing that, under the decisions of this court, such a piecing together of old elements constitutes no invention whatsoever, and that the patents in suit are therefore invalid. As we have said, however, we are not passing upon the question of validity; but assuredly such a process of selecting and fitting together takes the alleged invention out of the realm of the pioneer or the generic.

Finally, the appellant contends that, "where a patentee has supplied features that have brought success, where others who preceded him failed, the Court will not scan narrowly the means by which it has been attained." A study of the record and of the exhibits, however, convinces us that the observations we made in Lektophone Corporation v. Rola, supra, at pages 772, 773 of 34 F.(2d), are pertinent here: " * * * The evidence here simply indicates that the appellant has been remarkably successful in levying tribute upon a new and rapidly extending art. He has succeeded in asserting a monopoly in a new field, not in contemplation at all by the patentee when he made his invention. We cannot see that this success is as persuasive as such evidence sometimes is, as to the exercise of the inventive faculty. The appellant has been active in asserting its alleged monopoly, and has thus, no doubt, forced many to buy their peace in a situation so full of doubt, confronted by such dire penalties, as are involved in unsuccessful patent litigation. [Many cases cited.]"

We therefore conclude that, at best, the appellant's patents disclose combination inventions, and are therefore, as we have seen, to be strictly and narrowly construed.

We turn, finally, to the crucial question herein involved; namely, that of alleged infringement.

At the outset, it is observable that the appellees in appeal No. 7284 contend, as to claim 8 of patent No. 1,448,279: "If Claim 8 is to be sustained at all, it can only be by inclusion therein of the detachable inner pole piece 12 as an element. In that respect the combination seems to be novel, as we have not found a detachable inner pole piece in the prior art. But, whether novel or not, we do not use it."

The appellant replies that "the detachable pole tip is expressly covered by other claims than Claim 8, and to read this into Claim 8 would be to make the claims alike, which is contrary to the rules for interpretation of patent claims."

A study of the entire patent, however, discloses that there is "a unit assembly of sound box with its diaphragm and coil, outer pole piece and inner pole piece all in correct relation and ready to be mounted on the magnetizing structure," and that "The iron core 17 of the magnetizing coil 16 is bored out to form a seat for the [inner] pole piece 12 so as to make a good magnetic contact."

It would therefore seem that claim 8 is limited by the drawings and the specifications to a detachable inner pole piece.

It is well settled that a specification may be referred to for the purpose of limiting a claim. In McClain v. Ortmayer, supra, the court said: "The claim is the measure of [the patentee's] right to relief, and, while the specification may be referred to to limit the claim, it can never be made available to expand it."

Aside from all this, however, there are several reasons why we find that there has been no infringement of any of the claims in suit under the patents that we are now considering. Some of the devices used by both the appellant and the appellees are old; hence there is no infringement. Some of such devices are not claimed by the patents. One of the elements emphasized in the appellant's patents is not used by the appellees, nor, under the state of the prior art, can it be said that a mechanical equivalent thereof is to be found in the alleged infringing device.

We will take up seriatim the chief elements claimed in the appellant's patents, and examine the appellees' structures in the light of such disclosures and in the light of the prior art.

The appellant admits that certain drawings in the British patent of Sir Oliver Lodge show "a movable coil type of loud speaker," and that moving coils are disclosed by Johnsen, Pollák, Oliver, and Siemens.

Another element insisted upon by the appellant as necessary "to produce a practical and efficient loud speaker," and alleged to be found in the appellant's device, is "a peri-

pherally supported diaphragm capable of a comparatively wide range or amplitude of movement with an annular voice coil *rigidly* connected to the center thereof for driving the diaphragm." But Pridham admitted that the "feature of a diaphragm being supported entirely around its periphery" was not mentioned in any of the claims of No. 1,448,279, the patent in suit. Nor does claim 4 of No. 1,579,392 make such disclosure. Pridham also admitted that "practically all diaphragms are supported that way." Furthermore, Oliver discloses and claims "an annular coil secured to the vibrator[y] plate"; while Lodge refers to "a thin aluminum or other light cone or tripod connecting the vibrating coil a rigidly to the sound board d," and also teaches that "the said coil may be attached in any light and rigid manner to a sound board * * * or to the diaphragm d' of a microphonic transmitter."

Next, the appellant emphasizes that its device calls for a coil "disposed between inner and outer magnetic pole pieces in a *very narrow* annular air gap formed between the two pole pieces." But Pridham admitted that "in any magnetic apparatus the desirability of a narrow air gap was well known," and, further, that the "term 'narrow air gap' is not used in any of the claims."

Finally, we come to the element of alleged invention most stressed by the appellant, as constituting "a fundamental difference from the standpoint of the public." We refer to the spacing means between the pole pieces. In patent No. 1,448,279, a ring is used; in No. 1,579,392, a disc. The appellees' devices have spacing rings, or "brass collars."

Pridham himself emphasized that these spacing means were of the essence of his alleged invention. Referring to patent No. 1,448,279, he said: "The sense of the invention as here disclosed is the fact that the movable coil is protected from injury by the shifting of the pole piece, and this shifting of the pole piece is prevented by the use of a spacing ring (indicated in the patent by number 11) which is mounted upon the top plate of the instrument."

Of patent No. 1,579,392, Pridham pointed out: "The principal feature of merit in this case is that there is a means within the casing for holding the central pole in spaced relation with the top plate."

Spacing means were well known in the prior art. Referring to his device, Sir Oliver Lodge, called by the appellant, said:

"XQ. 19. You see the parts marked little 'f' in the drawings; do they serve to space concentrically the inner and outer pole pieces so as to maintain a definite annular air gap for the moving coil? A. Yes; that is what they are for.

"XQ. 20. Was not the said spacing-means entirely mechanical to maintain the outer and inner pole pieces concentrically? A. Yes. They were made to make an annular space suitable for the coil to be in. * * *

"XQ. 25. Was not that a simple and well-known expedient for spacing the poles which had no electric or acoustic function? A. I don't know that I quite understand that question.

"XQ. 26. Had the part 'f' any electric or acoustic function? A. No.

"XQ. 27. Was its purpose merely to position the poles? A. Yes. * * *

"XQ. 33. Sir Oliver, in a device such as that in the figure it would be desirable, would it not, that the inner and outer pole pieces should be definitely retained in concentric position so as to maintain an annular air gap for the moving coil? A. Oh certainly the magnet portions would be fixed."

Testifying for the appellees, George S. Holly, acoustic engineer of the Stewart-Warner Corporation, said:

"Q. In Defs. Ex. 7, the Lodge loudspeaker, which was made in accordance with the drawing, Defs. Ex. 9, what if any function is performed by the spool head 10 of the magnetic spool? A. It acts as the spool head of the magnetic coil, and at the same time fits rather snugly against the sides of the shell, as indicated by D, in such manner that the center pole F is rather rigidly held in position.

"Q. Does that snug fit between the spool head 10 around the inner pole F and against the interior of the cylindrical pole shell D have any effect upon spacing the inner pole with relation to the center pole? A. Yes, obviously it spaces the center pole in the center of the annular air gap."

Since Holly's testimony was given in open court, the District Judge was in a better position than we to judge of the credibility of the witness.

In this connection, it is observable that United States patent No. 903,745, issued to C. E. Pearson on November 10, 1908, refers to "a piece of non-magnetic material, as brass, sleeved over the pole piece 3, and passing within the pole piece 5, to secure a defi-

nite and fixed relative position of said pole pieces."

Indeed, the admissions of Pridham, the coinventor of the appellant's device, clearly established that the spacing means was well known in the prior art.

As to the brass collar and plate f in the British patent of Dr. Lodge, Pridham testified:

"Q. It would space them in whatever position was desired? A. That is correct.

"Q. And, of course, it would be desirable, when an annular air gap is to be formed, to receive a voice coil, that they should be concentric, would it not? A. Very desirable."

Herbert E. Metcalf, the appellant's other expert, testified as follows regarding the function of the same Lodge sleeve f:

"Q. You have not any doubt, have you, as to this sleeve f shown in these various figures, and which is rigidly connected to the inner pole piece and the outer pole piece, serving as a spacer to space the inner and outer pole pieces? A. It might serve as a spacer.
* * *

"Q. Considering, then, for the purpose of my question, that that is an outer pole piece, such, for instance, as shown in the figure at that point, and that C is an inner pole piece extending at its upper end into the circular wall in the outer pole piece, this sleeve rigidly secured to both of them would necessarily keep those pole pieces concentric? A. Yes."

In this connection, it is to be noted that Metcalf insisted that the Lodge drawing shown to him did not disclose a loud-speaker. It is observable, however, that the provisional specification of Sir Oliver Lodge's British patent referred to one of its chief objects as being "generally to improve the conditions under which telephony is carried on so as to magnify enormously every fluctuation of current and thus produce a loud sound from a feeble stimulus for any useful purpose"; and mentioned a "loud speaking iron disc or diaphragm telephone," and a "bellowing telephone." The complete specification designated two of the figures as representing forms "of loud-speaking telephone," and disclosed that "the final instrument of the series is usually a loud speaking iron disc or diaphragm telephone." The complete specification also reiterated the statement in the provisional one, to the effect that one of the chief objects was "to magnify every fluctuation of current."

Again, when shown a drawing from one of the Lodge publications, Pridham testified:

"Q. Assuming that this disc 10 in this figure does fit snugly within the interior of the cylinder D, and also closely surrounds the inner pole piece F, it would then serve to center the inner pole piece within the opening and the cap P of the outer pole piece, would it not, on that assumption? A. With this limitation, that if that pole piece 10 were of sufficient mechanical strength and fitted closely against the axial pole and fitted into the cylinder closely, then it would be spacing means, yes."

It will be remembered that Holly, with the same drawing before him, testified that the same "spool head 10" of the Lodge device would serve as a spacer.

Metcalf made a similar admission, in connection with the identical drawing:

"Q. So as shown in that drawing, if the head of that spool is made out of the usual materials, any hard rubber or anything of that sort, that would center the inner pole piece with relation to the opening into which it extends in the outer pole piece P? A. If it was made with such precision and of such materials."

Finally, when shown a drawing of the Pollák patent, No. 939,625, which states that "plate 8 of non-magnetic material serve for fastening the core 7 in the shell," Pridham testified:

"Q. Still referring to the Pollák patent, the disc 8 is shown in that drawing as closely engaging at its outer periphery within the cylindrical portion 6 of the outer pole piece; is that correct? A. Yes. * * *

"Q. As shown, would not the necessary effect of that be to immovably space the inner pole piece with relation to the outer pole piece? * * * A. I would say it would fix it in relation, not space it."

At last Pridham said:

"Q. Would not any one knowing anything about the subject, and with this Pollák patent before him, know that it would be desirable to have the space in which that cylindrical coil vibrates formed by concentric inner and outer walls? A. I think that is part of our invention.

"Q. Just a moment; answer the question, please. A. Yes."

And so Metcalf:

"Q. So this disc 8, as shown in the drawing, would serve as a spacer to locate the inner pole 7 concentrically within the cap 1 of the outer pole piece? A. It probably would if used for that purpose.

"Q. Irrespective of whether it was used for that purpose, Mr. Metcalf, it would perform that function, would it not? A. Probably."

From the foregoing, we see that spacing means, admittedly the head and front of the appellant's invention, were either already well known to the art or would have been suggested to any skilled mechanic with the prior patents before him. Under such circumstances, the use of a spacer cannot constitute infringement.

We advance to the final argument against infringement; namely, that the appellees have discarded the sound box and its inclosed diaphragm, disclosed in the appellant's patents, and use a cone made of stiff paper or analogous material.

In the language used by this court in Dunkley Co. v. Central California Canneries, 7 F.(2d) 972, 975, certiorari denied, 270 U. S. 646, 46 S. Ct. 347, 70 L. Ed. 778: "Plaintiff's is a combination patent; all of its elements are old. In such case the patent is limited to the specific combination. A defendant who omits one of the material elements of the combination does not infringe. [Many cases cited.]"

Again, in Wilson, etc., Co. v. Union Tool Co., supra, this court said: "It is clear that all of the elements of the Double combination patent, No. 734,833, were old in the art. This being true, the claims of invention in the patents should be limited to the specific combinations of elements as covered in the claims of the patent. Combination of elements which are old in the art undoubtedly may be invention, but the combination must be considered as an entirety or unitary structure. If defendant omits one or more of the material elements which make up the combination, he no longer uses the combination; and it is no answer to say that the omitted elements are not essential, and that the combination operates as well without as with them. Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 301, 29 S. Ct. 495, 53 L. Ed. 805; Evans et al. v. Hall Printing Press Co., 223 F. 539, 139 C. C. A. 129. It must also be established by one who alleges infringement of a combination that the entire combination, as a unitary structure and having substantially the same mode of operation, is present in the alleged infringing machine. [Case cited.]"

In this question of sound box versus free-air cone, we again find inconsistency in the appellant's briefs. For instance, the appellant says that the expression "a sound box including a diaphragm" *embraces* "any sort of sound-producing apparatus, * * *" including the appellee's free-air cone devices.

Again, the appellant introduced in evidence a chart entitled "Variations in Form of Sound Box," which showed two typical free-air cones, one of them of the type used by the appellees.

From the foregoing, one would gather that the appellant contends that a free-air cone *is* a sound box. But in its reply brief the appellant says: "It is not the contention of plaintiff that defendants' [appellees'] cone is a sound box. We say it is a diaphragm, and that the housing in which it is mounted is the equivalent of a sound box as specified in the claims of the patents in suit," etc.

However that may be, we are of the opinion that a free-air cone is neither a sound box nor the mechanical equivalent thereof.

Dr. Paul E. Sabine, one of the appellees' experts, thus succinctly explained the difference between the construction and operation of a cone diaphragm such as is present in the appellees' loud-speaker, and a sound box diaphragm, such as is illustrated in the two patents in suit:

"A. Both devices, of course, are operated by the reaction between an alternating current and a magnetic field. In other words, they are both of the electrodynamic type of sound reproducer.

"In the Pridham and Jensen device the moving coil is attached to a small, relatively stiff, diaphragm rigidly clamped at its periphery and this diaphragm constitutes one side of the sound box. The small amplitude of the pressure vibrations of the diaphragm in the Pridham and Jensen device is converted into larger amplitude vibrations over a large area through the medium of the sound box and horn.

"In the cone type the vibrating member is of light construction flexibly mounted and held at its periphery and is thus relatively free from elastic restraints. Its vibrations are correspondingly greater and these vibrations are transmitted directly to the free atmosphere without the intervention of the coupling system which comprises the sound box and horn. * * *

"In the clamped diaphragm type you have a dense diaphragm creating large pressure changes in a small air cavity.

"In the cone type you have large amplitudes transmitted directly to the air."

Clair L. Farrand, another of the appellees' experts, said that the free-air cone does not employ the horn.

These structural and functional differences between the two types of devices, when a horn is used with the sound box, were admitted by Pridham:

"Q. Then let us go a step further. The vibrations which are communicated by the diaphragm to the air in that space in the sound box, those vibrations are then communicated when a horn is used to the larger volume of air in the horn, are they not? A. That is correct. * * *

"Q. In the cone diaphragm type of loudspeaker, such as the defendants' there, the vibrations of the voice coil are communicated directly to the conical diaphragm, and from the conical diaphragm directly to a comparatively large volume of air within the diaphragm; is that correct? A. That is correct."

The evidence tends to show that, to operate as a loud-speaker, the appellant's machines require horns. While we have considered such evidence, we are not basing our decision upon it.

Not only the lack of identity, but the positive contrast, existing between the sound box and the free-air cone types, have been adjudicated by the Supreme Court and other federal tribunals.

In Lektophone Corp. v. Rola Co., supra, at pages 169 and 170 of 282 U. S., 51 S. Ct. 93, the Supreme Court said:

"The object is the 'direct propagation, in free air, from a record or equivalent element subjected to the action of the original sound waves or vibrations, of self-sustaining sound waves substantially corresponding in intensity and amplitude, as well as in pitch or timbre, to the said original sound waves'; as distinguished from the then prevailing use of the sound box and horn. The device, as set forth in claim 8, comprised 'a tympanum embodying a bodily movable, central conical portion, and an annular rim which encircles said conical portion and which is rigidly supported, said conical portion being freely exposed on all sides to unconfined air and being of sufficient area to produce self-sustaining sound waves in the surrounding air when vibrated.' * * *

"The contribution of Hopkins, if he made one, as held in several cases in the lower Courts and abroad, was to combine abandoning the sound box, determining the size of the cone deemed by him most suitable to reproduce the sounds communicated to it by vibration," etc. (Italics our own.)

Similar expressions emphasizing the points of difference between the sound box and the free-air cone types are to be found in Lektophone Corporation v. Sylo Lighting Fixture Co. (C. C. A. 2) 16 F.(2d) 7; Lektophone Corporation v. Western Electric Co. (D. C.) 20 F.(2d) 150, 151; Lektophone Corporation v. Crosley Radio Corp. (D. C.) 46 F.(2d) 126, affirmed (C. C. A. 6) 48 F.(2d) 1077; Lektophone Corporation v. Colonial Radio Corporation (D. C.) 46 F.(2d) 131, 135.

There is still another argument against the mechanical equivalence of the sound box and the free-air cone. Each claim of the two patents that we are now considering contains a reference to a sound box. The application for patent No. 1,448,279, however, contained at least one claim, No. 3, in which no mention was made of a sound box. This claim was canceled. This would indicate that, in order to find that the appellees' free-air cones infringe on the sound-box type adopted by the appellant, we should have to give to the limited claims in suit the broad interpretation that would have been merited only by unlimited claim 3, which was canceled. This we do not believe that we should be justified in doing.

The appellant, however, contends that the appellees have made "a close copy of plaintiff's modern commercial instrument * * * which has been on the market since the Spring of 1927, and they made an exact copy of * * * an instrument made by one of plaintiff's licensees, to-it, The Utah Company, under the patents in suit, said Utah instrument having been engineered by plaintiff's engineers."

An inspection of the originals of each of these alleged "copies" discloses that they are of the free-air cone type. On this subject Pridham testified as follows: "In the development of our own loudspeaker, we changed from a horn to a hornless type and employed the large conical diaphragm as shown in Plff's. Ex. 5. This occurred in the Spring of 1927. We put a conical diaphragm dynamic speaker on the market."

But, as we have seen, every claim of the two patents specified a sound box. And it is axiomatic in the patent law that infringement depends, not upon what is manufactured or

448

sold by the patentee, but upon what he has *patented.*

In Grand Rapids Show Case Co. v. Weber Show Case & Fixture Co., 38 F.(2d) 730, 731, certiorari denied, 281 U. S. 767, 50 S. Ct. 465, 74 L. Ed. 1174, the late Judge Dietrich, of this court, said: "It may be true that the cases which appellant [the patentee] actually manufactures and markets much more closely resemble the defendant's structure, but its suit is necessarily predicated, not upon what it manufactures, but upon what it has patented."

In Simplex Window Co. v. Hauser Reversible Window Co., 248 F. 919, 926, we made the following observations, which we deem applicable here: "It is apparent, from a comparison of the two devices, that they both produce the same result. The real question is: Do they do so by substantially the same means? It is needless to cite the numerous cases in support of the law clearly stated in section 348 of Walker on Patents, the substance of which is that changing the relative position of the parts of a machine does not avert infringement, where the parts transformed perform the same respective functions after the change as before, but that such change does do so where the changing of those positions so changes the functions of the parts that the machine acquires a substantially different mode of operation, even though the ultimate result remains the same."

In the instant case, however, there has been more than a mere change of position. An entirely different and even *opposite* type of device is used in the alleged infringing machines. In such circumstances, the language of this court in Stebler v. Porterville Citrus Ass'n, 248 F. 927, 930, is peculiarly apposite: "While the same result is accomplished in the defendant's machine as in the complainant's, there appears to be such a variation of means as to avoid infringement in the features complained of. [Case cited.]"

See, also, Kokomo Fence Machine Co. Case, supra.

Accordingly, after a careful study of the briefs and the thousands of printed pages that make up the transcripts and the documentary exhibits of the two appeals, and a minute scrutiny of the more than a score of physical exhibits submitted to us, we have arrived at the conclusion that the lower court was correct in each of the three suits in finding that there was no infringement of the appellant's three patents.

Decrees affirmed.