**NDM CORPORATION, Appellant,**

v.

**HAYES PRODUCTS, INC., and Joseph H. Johnson, Appellees.**

**No. 77–3900.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1980.

Decided March 16, 1981.

Rehearing and Rehearing En Banc Denied June 5, 1981.

James R. Uhlir, Graybeal, Barnard & Uhlir, Seattle, Wash., argued for appellant; John O. Graybeal, Seattle, Wash., on brief.

Kenneth W. Vernon, Seattle, Wash., argued for appellees; Richard W. Seed, Seattle, Wash., on brief.

Before SKELTON,[*] GOODWIN and FERGUSON, Circuit Judges.

GOODWIN, Circuit Judge.

NDM Corporation appeals from a judgment in a patent infringement action that various claims of medical electrode patents which had been assigned to NDM were invalid for obviousness. We affirm.

NDM began,[1] in 1969, to develop medical electrodes for use in the electrocardiographic monitoring of heart patients. Initially, NDM attempted to manufacture a "dry" electrode that would be activated by moisture in the patient's skin, rather than by application of a "wet" electrode gel. These efforts proved unsuccessful and NDM subsequently decided to develop an improved "wet" electrode.

The first product of these efforts was U.S. Patent No. 3,696,807 ("the '807 patent"), filed on February 13, 1970, issued on October 10, 1972. In laymen's terms, the '807 medical electrode patent was a rigid, nonconductive electrode gel cup which had a snap fastener mounted in its base. An elastic sheet covered the cup. This elastic, when pressed against a patient's skin, would adhere, forming a seal. Because of this seal, electrolyte gel remained in the cup, rather than leaking and causing the electrode to become loose. The snap fastener provided conduction. Increased adhesion facilitated long-term cardiac monitoring. The '807 design was not "pre-gelled." Electrolyte gel had to be added to the electrode cup at the time it was applied to the patient.

NDM's next development was a "pre-gelled," "ready-to-use" electrode, U.S. Patent No. 3,701,346 ("The '346 patent"), filed on January 4, 1971. In addition to the elements of the '807 patent, the '346 patent had an absorbent pad prefilled with electrolyte gel. The attached pad, which remained out of the electrode cup during storage, compressed into the cup when the electrode was applied to a patient. This created a stable gel column between the patient's skin and the electrode's snap conductor, insuring accurate monitoring. The '346 patent also included a cover to protect the gel pad during storage.

The '346 patent enjoyed immediate and substantial commercial success. In the last quarter of 1970, NDM sold a quarter million of the ready-to-use electrodes. In 1973, NDM sold 18 million electrodes; by 1976, when this action was tried, NDM had annual sales of thirty million electrodes.

In 1973, NDM brought this action against Hayes Products for patent infringement.[2]

---

[*] The Honorable Byron G. Skelton, Senior Judge, United States Court of Claims, sitting by designation.

[1] Bionetics, Inc. was NDM's predecessor corporation. Bionetics developed the '807 and '346 patents. In March 1972, Bionetics and the original NDM corporation, which marketed Bionetics electrodes, merged. The surviving corporation, appellant NDM Corporation, acquired title to the Bionetic medical electrode patents. Hereafter, "NDM" refers to its predecessor corporation where appropriate.

[2] NDM claimed infringement of four patents: the '807 patent (U.S. Patent No. 3,696,807), the '346 patent (U.S. Patent No. 3,701,346), and two continuations of the '807 patent and 3,820,-531). NDM concedes in this appeal that the validity of the continuation patents hinges on the validity of the '807 patent. Accordingly, discussion of the additional claims of the continuation patents is unnecessary. NDM has limited its action to claims 15 and 17 of the '807 patent and claims 1 and 8 of the '346 patent.

Hayes Products counterclaimed, seeking a declaration that NDM's patents were invalid for obviousness.

The district court evaluated Hayes products' assertion of obviousness[3] under the criteria described in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). It used ten references to define the scope and content of the relevant prior art.[4] Five of the references,[5] had not been before the patent examiners when the '807 and '346 patents were granted.

After reviewing all the references before it, the district court invalidated the patents on the grounds of obviousness. NDM appealed.

*The Presumption of Validity.*

■ Patents issued by the U.S. Patent Office are presumed valid. 35 U.S.C. § 282.

Claims 15 and 17 of the '807 patent read as follows:

"15. In a medical electrode, a low profile non-conducting, relatively rigid, collapse resistant cup member having a base and a rim, apertured elastic sheet means connected to said cup member overlying said rim, an adhesive on the lower surface of said sheet means adjacent and in surrounding relation to said rim, a snap fastener projecting through said base and supported by said base remote from said rim, said snap fastener projecting through an aperture in said sheet means, and a removable protective cover for said adhesive.

. . . . .

"17. The medical electrode of claim 15 wherein said snap fastener has interfitting parts holding said cup member and said sheet means in assembled relation."

Claims 1 and 8 of the '346 patent read as follows:

"1. A medical electrode of the type adapted to be adhered to the skin and having means defining a cavity opening to the skin and a conductive member of the base of the cavity, wherein the improvement comprises a pad of resilient cellular material loaded with electrolyte and substantially filling said cavity, said pad having a thickness greater than the depth of said cavity whereupon said pad projects outwardly of said cavity when said electrode is stored and is compressed into said cavity when said electrode is adhered to the skin whereupon said pad is held against movement within said cavity during use of the electrode, and a removable covering for said pad when stored, said covering comprising sheet material having a raised portion overlying said pad and accommodating said greater thickness of said pad.

. . . . .

"8. A medical electrode for use on the skin including an inverted cup member; a flexible elastic sheet overlying and surrounding said cup member; an adhesive layer on the same side of said elastic sheet as said cup member; means securing said elastic sheet to said cup member including an electrically conductive member projecting through the base of said cup member adapted to be electrically connected to an external electrically responsive member; and a pad of resilient cellular material soaked with electrode jelly located in and substantially filling the interior of said cup member, said pad having a thickness exceeding the depth of said cup member whereby said pad is compressed between said electrically conductive member and the skin of a subject to which said elastic sheet is applied, whereby said pad is held in a substantially fixed position during use of the electrode, and a removable covering to protect said pad prior to use of said electrode, said protective covering comprising sheet material and having a raised portion overlying said pad and accommodating the thickness of said pad which exceeds the depth of said cup member."

3. 35 U.S.C. § 103 reads:

"A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

4. The prior art considered by the district court were the following:

(1) Baum et al, U.S. Patent No. 3,187,745;
(2) Berman et al, U.S. Patent No. 3,085,577;
(3) Tatoian, U.S. Patent No. 3,587,565;
(4) Phipps et al, U.S. Patent No. 3,170,459;
(5) Edmark, U.S. Patent No. 3,487,827;
(6) NASA publication SP–5054, "NASA Contributions to Bioinstrumentation Systems, A Survey by Weltman et al," 1968, pp. 15–24;
(7) Devices, Inc. electrode (Exh. A–10);
(8) IMI electrode and brochure (Exh. A–11 and A–33);
(9) "Which Disposable Chest Electrode?" P.J.B. Hubner; *British Medical Journal, 3,* pp. 507–510 (August, 1969);
(10) "A Press-Stud Electrode for Continuous Monitoring of the Electrocardiogram", D.C. Fluck and P.A. Burgess, *The Lancet,* Vol. I, p. 1405 (June 25, 1966).

5. The patent examiners did not consider the prior art listed as 6–10, in note 4, supra.

This presumption dissipates, however, by a showing that pertinent prior art was not cited to the patent examiners. *Hewlett-Packard Company v. Tel-Design, Inc.*, 460 F.2d 625, 628–629 (9th Cir. 1972); *Ceco Corp. v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 691 (9th Cir. 1977).[6] Prior art is pertinent if it discloses something not disclosed by the other prior art; in other words, it may not be cumulative. *Speed Shore Corp. v. Denda*, 605 F.2d 469, 471 (9th Cir. 1979).

NDM argues that the trial court improperly denied its patents the benefit of the presumption. NDM concedes that five pieces of prior art were not considered by the patent examiners. It argues, however, that the "prior pertinent art not considered" exception should not invalidate the statutory presumption because four pieces of the prior art were not pertinent and the other was inadmissible. NDM's argument is not convincing.

■ As a preliminary matter, we note that the district court's failure to make an express finding that the statutory presumption had been overcome was not prejudicial error. *Hewlett-Packard Company v. Tel-Design, Inc., supra*, 460 F.2d at 628.

The district court correctly believed that the two British articles[7] describing a "Devices Electrode" were prior pertinent art not considered by the patent examiners. The Devices Electrode, described by the British Publications, had a snap fastener remote from the rim of the cup member of the electrode, projecting through and supported by the base of the cup member.[8] Yet, during the prosecution of the '807 pat-

ent, NDM's attorney stated the following to the examiner:

"... it is submitted that there is no teaching in ... [the] prior art of record that the snap fastner be remote from the mouth or rim of the cup member, or that the snap fastner project through and be supported by the base of the cup member." (Exh. A–5 p. 53).

Thus, these British articles, which appeared before the '807 patent was issued and were not before the patent examiners, were pertinent prior art. They were not cumulative in describing an electrode with a snap fastener remote from the rim.

■ Therefore, substantial evidence exists for the trial court to have denied NDM the benefit of the presumption. The presumption was overcome by prior pertinent art not before the patent examiners.

*Obviousness.*

■ Although obviousness is a legal determination, it is based on a three part factual test set forth in the landmark case of *Graham v. John Deere, Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The trial court must determine (1) the scope and content of the prior art, (2) ascertain the differences between the prior art and the claimed invention, and (3) measure their differences by the level of ordinary skill possessed by a person familiar with the pertinent art. Relevant subconsiderations include the commercial success of the invention, the extent to which it resolved long-felt needs, and the difficulty of the problem solved by the invention.

---

6. In several circuits "even one [pertinent] prior art reference not cited to the examiner overcomes the presumption [of the patent's validity]." *Turzillo v. P & Z Mergentime*, 532 F.2d 1393, 1399 (D.C.Cir.), *cert. denied*, 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1976); *Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963, 972–973 (7th Cir. 1979). While no Ninth Circuit case expresses so strict a rule, the existence of "some" pertinent prior art references not cited to the examiner destroys the presumption. *Ceco Corp. v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 691 (9th Cir. 1977).

7. *See* numbers 9 and 10 in note 4, *supra*.

8. NDM contends that the rim of The Devices electrode is wider and flatter than the rim of the '807. NDM argues that '807 is more easily attachable to rounded surfaces like human skin. This argument goes to the significance of the difference between the prior art and the '807 patent, not to the pertinence of the British publications. To the extent that NDM argues that Devices teaches cumulative learning, it makes a conclusory statement, and no more.

■ The factual findings underlying the "obviousness" determination are reviewed under the Rule 52(a) standard. *Photo Electronics Corp. v. England,* 581 F.2d 772, 776 (9th Cir. 1978). Unless the findings are clearly erroneous we must sustain them. The district court's factual findings support its conclusion that NDM's patent was obvious and are not clearly erroneous.

*Scope and Content of the Prior Art.*

Of the ten separate pieces of prior art before the district court,[9] five had not been before the patent examiners.[10] NDM contends that the Devices, Inc. electrode was improperly admitted as prior art. It argues that the electrode was inadmissible under 35 U.S.C. § 103 to show obviousness because it was not prior art within the meaning of 35 U.S.C. § 102. The Devices, Inc. electrode apparently was not "in public use or on sale in this country" as required by § 102(b). NDM argues that § 102 is the exclusive referent for ascertaining prior art under § 103.

■ We need not decide the very thorny question of the relationship between § 102 and § 103 and the extent to which prior art under one may serve as prior art under the other.[11] The trial court correctly admitted as prior art the British publications in which the Devices, Inc. electrode was described.[12] The district court did not need the electrode itself to compare the Devices, Inc.'s electrodes with NDM's electrodes. Therefor, the admission of the Devices, Inc. electrode as part of the prior art did not prejudice NDM.

*The Level of Skill in the Art.*

NDM does not contend that the district court's finding on this issue was clearly erroneous. We thus may move on to consider the heart of this lawsuit.

9. *See* note 4, *supra.*

10. *See* note 5, *supra.*

11. *See generally,* Chisum, *Sources of Prior Art in Patent Law,* 52 Wash.L.Rev. 1 (1976).

12. *See* numbers 9 and 10 in note 4, *supra.*

*The Differences Between the Prior Art and the NDM Patents*

*'807 Patent*

The trial court invalidated the '807 patent on grounds of obviousness after careful comparison of the '807 and the prior art. In Finding of Fact 49, the trial court found that the

"Berman et al Patent No. 3,545,432, Tatoian Patent No. 3,587,565 and the IMI brochure, all recognized the use of a resilient foam pad in combination with a cup electrode to hold the cup member of an electrode against the skin, the same purpose and function stated in the specification of the '807 [patent's elastic sheet] . . . ."

And in Finding of Fact 55, it found that

"Prior to the alleged invention of the '807 patent it was known to use a snap fastener having interfitting parts not only to serve as the conductor element of the electrode but to, at the same time, clamp various elements of the electrode together." [The Edmark and Berman patents in particular disclosed this.]

The court also cited the Devices, Inc. electrode description in the British publications in Finding of Fact 56 as disclosing the obviousness of a snap fastener. Substantial evidence permitted the court to find the patents obvious.

The British publications relating to the Devices, Inc. electrode disclose a (1) low-profile, non-conductive, relatively rigid, collapse-resistant cup having a base and a rim;[13] (2) a sheet means connected to the cup and surrounding the rim;[14] (3) a snap fastener projecting through the base of the cup and supported by the base of the cup remote from the rim;[15] and (4) a remova-

13. *See* the plastic cup 2 described in number 10 note 4, *supra.*

14. *See* the Beckman double-baked sticky ring 6 described in number 10, note 4, *supra.*

15. *See* the press stud electrode 4 described in number 10, note 4, *supra.*

ble protective cover for the adhesive.[16] These four characteristics were claimed in the '807 patent.[17]

In addition, the IMI brochure, the Berman '432 and the Tatoian '565 disclose the use of adhesive-backed foam pads to hold the electrode in place. No different result is obtained by the use of the '807's "elastic sheet."

On the basis of this evidence, the district court could have concluded that '807 patent was obvious to one skilled in the art.

*'346 Patent*

The patentable differences between the '807 and '346 patents were the presence and configuration of the gel-soaked pad in the cup member and the presence and configuration of the cover for the gel-soaked pad.

In Findings of Fact 61 and 62, the district court held that the existence and use of a gel-soaked pad in the cup of a medical electrode, and the existence and use of a protective cup over such a gel-soaked pad were disclosed by the Baum et al patent No. 3,187,745 and the NASA publication.[18]

NDM does not dispute that the "concept of a pre-gelled, disposable, surface-mounted biomedical electrode" existed prior to the '346 patent. The Baum '745 and NASA publication disclose that. NDM contends instead that "an electrode having a resilient pad which is oversized during storage and is then compressed upon application to a subject is not disclosed in any of the art of record." This is what NDM's attorney argued before the patent office to distinguish the claims of the '346 patent from the Baum '745.

Essentially, the only difference between the '346 patent and the Baum '745 patent is in the protective cover for the pad. The

Baum '745 compresses *all* of the gel to the level of the rim of the cup. In the '346 patent, on the other hand, the dimple in the cover compresses *part* of the gel below the level of the rim of the cup permitting the rest of the gel pad to remain above that level.

The district court believed this difference to be obvious. Substantial evidence supports the findings. The NASA SP-5054 publication discloses an electrode having an electrolyte-soaked gel pad with a thickness greater than the cup. The gel pad is stored in an uncompressed state but is compressed partially into the cup when the helmet incorporating the electrode is fitted to the astronaut's head and the electrode touches the scalp.

Even without this disclosure, the court could have found the '346 patent obvious. There is no functional difference between the Baum '745 and the '3466 once the protective cover of each is removed. It may well be as NDM argues that the '346 was an improvement [19] over the '745, achieving a more stable gel column when applied to the skin. But "[i]n applying Section 103 . . . the test is not whether the object is an improvement in the art; . . ." but whether an improvement is obvious to one skilled in the art. *Reinke Mfg. Co., Inc. v. Sidney Mfg. Corp.*, 594 F.2d 644, 646 (8th Cir. 1979). " '[A]n improvement which is obvious . . . is not entitled to protection.' " *Id.* The record supports the trial court's conclusion that the '346 patent was obvious to one skilled in the art.

*Secondary Considerations of Nonobviousness.*

■ NDM points to the considerable commercial success of its electrode, arguing

---

16. *See* the release paper on the lower side of the Beckman double-backed sticky disc described in number 10, note 4, *supra*.

17. *See* claim 15 of the '807 patent, note 2, *supra*.

18. In Finding of Fact 63, the district court improperly took judicial notice of the obviousness

of the patentable differences between the prior art and the '346 patent. Because the finding was not necessary to the court's decision, the error was harmless.

19. The trial court found the improvement to be substantial.

that the devices resolved a long-standing problem in cardiac monitoring. These factors are relevant to determining patentability, *Graham v. John Deere Co.*, 383 U.S. at 12, 86 S.Ct. at 691, but they are of secondary importance. *Id.* at 18, 86 S.Ct. at 694. Their consideration is permissible, not required, and their presence or absence is not alone determinative of obviousness. *Id., see also, Penn Intern. Industries v. Pennington Corp.*, 583 F.2d 1078, 1081 (9th Cir. 1978). Indeed, where patents are obvious, they cannot be saved from invalidity by a resort to such secondary considerations. *Jeddeloh Brothers Sweed Mills, Inc. v. Coe Manufacturing Co.*, 375 F.2d 85, 91 (9th Cir.), *cert. denied*, 389 U.S. 823, 88 S.Ct. 57, 19 L.Ed.2d 76 (1967).

The district court in this case had substantial evidence to find the '807 and '346 patents obvious. It was not bound by the secondary considerations alluded to by NDM.

*Synergism: '807 and '346 Patents.*

 The synergistic test of patentability of combination devices derives from *A. & P. Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), *reh. denied*, 340 U.S. 918, 71 S.Ct. 349, 95 L.Ed. 663 (1951). Patents may be issued for inventions which combine elements existing in the prior art if the result is "unusual or surprising." *Id.* at 152, 71 S.Ct. at 130; *see also, Photo Electronics Corp. v. England*, 581 F.2d 772, 775 (9th Cir. 1978). "[This test] is not inconsistent with, but merely in application of, the general rule stated in § 103...." *Reeves Instrument Corp. v. Beckman Instruments, Inc.*, 444 F.2d 263, 271 (9th Cir.), *cert. denied*, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). *Cf. Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963 (7th Cir. 1979), *Plastic Container Corp. v. Continental Plastics*, 607 F.2d 885 (10th Cir. 1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648

(1980). (The Seventh and Tenth Circuits recently rejected synergism as a separate test of patentability because of its inconsistency with § 103 analysis.) But the test is a much more stringent rule of patentability than the usual § 103 test, because "non-obviousness is less likely to occur in combination patents, ...." *Reeves Instrument Corp. v. Beckman Instruments, Inc., supra*, 444 F.2d at 271, which are simply amalgams of old elements. *See also, Palmer v. Orthokinetics, Inc.*, 611 F.2d 316, 323 (9th Cir. 1980).

 If the trial court had substantial evidence to find the '807 and '346 patents obvious, it also had sufficient evidence to find them lacking in synergism. *Schimizzi v. Chrysler Corp.*, 462 F.Supp. 630, 639 (S.D. N.Y.1978); *see also, Bird Provision Co. v. Owens Country Sausage, Inc.*, 568 F.2d 369, 378 (5th Cir. 1978) (no need to consider synergism were patent invalid for novelty and obviousness). If the test for synergism is more strict than the usual rule of § 103, and it is, then the district court could not have found the patents invalid for obviousness, but valid for evidencing synergism.[20] On the record before us, we have concluded that the district court could have found the NDM patents invalid for obviousness. Therefore, this conclusion subsumes within it a finding that the patents lack synergism.

Affirmed.

---

**20.** The trial court found that the stable gel column created by the '346 patent produced "surprising and unexpected" improvements in offset voltage readings. In Finding to Fact 58, the court expressly found that the '807 patent lacked synergism.