**OMARK INDUSTRIES, INC.,**
**Plaintiff-Appellee,**

v.

**TEXTRON, INC., Defendant-Appellant.**

**No. 79–4544.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 1981.

Decided Sept. 27, 1982.

John M. Webb, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., for defendant-appellant.

Kenneth S. Klarquist, Klarquist, Sparkman, Campbell, Leigh, Hall & Winston, Portland, Or., for plaintiff-appellee.

Before ANDERSON and CANBY, Circuit Judges, and CRAIG,[*] District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Omark, as assignee of the Graversen patent (U.S. Patent No. 3,929,049), initiated this action against Textron alleging infringement of the assigned patent. Textron answered by denying infringement and counterclaimed alleging the invalidity of the patent. The parties stipulated to have the case tried before United States Magistrate George E. Juba. In a written opinion, which constituted the findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a), Magistrate Juba determined that claims 2 through 4 of the patent were valid and infringed. Thereupon, the district court, Judge Otto R. Skopil presiding, entered judgment enjoining Textron's infringement and finding that Omark was entitled to an accounting to determine its damages and its right to attorneys' fees and interest. Textron's counterclaim was dismissed. The injunction and accounting were stayed pending the outcome of this appeal. The district court had jurisdiction pursuant to 35 U.S.C. § 281 and 28 U.S.C. § 1338(a). The primary issues raised by Textron on appeal are whether the district court properly found the patent infringed and whether the district court erred in failing to find the patent invalid for obviousness. We affirm.

## I. FACTUAL BACKGROUND

The subject matter of the patent in suit is a saw chain for use on power chain saws. Chain saws came into popular use in the late 1940's and early 1950's. In the early 1960's, consumer chain saws arrived on the market. These saws were more lightweight, less expensive, and of lower horsepower than the commercial saws of the day. It is the design of the chain for such a consumer saw that is the subject of this appeal.

A typical saw chain consists of drive links, cutting links and tie straps which hold the two links together.[1] The cutting link is the key link in the operation of a chain saw. It has a base portion which includes two rivet openings for connecting it to the adjoining drive links. The base rides on the chain saw bar. Extending upward from the base is a depth gauge portion and a cutting portion separated by a recess. The depth gauge portion precedes the cutting portion in its path through the wood. The depth gauge, as its name implies, controls the depth of the cut made by the chain.

A saw chain is identified primarily by its pitch. The pitch of the chain is the average distance between the centers of three successive rivet holes. The pitch of a particu-

[*] The Honorable Walter E. Craig, Senior United States District Judge, District of Arizona, sitting by designation.

1.

Typical saw chain

A--Drive Link

B--Tie Strap

C--Cutting Link

D--Cutting Link Base

E--Depth Gauge

F--Cutting Edge

G--Pivot Point

H--Rivet Hole

(Drawing extracted from Cox U.S. Patent No. 2,508,784, May 23, 1950)

lar link is the distance between the centers of the rivet openings in such a link.[2]

The early saw chains had pitches of ⅝ inch and higher. The first consumer saws used chains with a pitch of ¼ inch. This size chain was an efficient cutting device but, because of the number of links required, it was expensive to manufacture.

In 1972, the high cost of the ¼ inch chain led Omark to begin the development of a less expensive chain for use on consumer chain saws. Graversen, who worked for Omark, ultimately applied his efforts in developing a ⅜ inch pitch chain which incorporated cutting links used on the ¼ inch chain. The cutting link was redesigned with a longer base to maintain chain stability.

This chain also utilized what can be termed a guard portion on the drive links that extended upward to protect the depth gauge and lessen the danger of "kickback." Kickback is the tendency of chain saws to react violently upward if an object contacts the chain as it travels around the upper portion of the nose of the saw bar. The bar is the portion of the saw on which the chain rotates. Conventional saw chains typically had depth gauges with substantially straight leading edges. As the chain travels around the upper portion of the nose of the bar, the leading edge of the depth gauge can become exposed and hook on branches and other objects. Such hooking could then rapidly and powerfully force the bar of the saw up towards the operator. Numerous injuries have resulted from this phenomenon. Prior to the Graversen invention, the universally adopted method of minimizing kickback was the use of safety or guard links. These links were designed to protect the leading edge of the depth gauge as the cutting links travel around the nose of the bar. While these safety links helped lessen kickback, they did not prevent it. They also reduced the efficiency of the saw chain and increased costs.

With this in mind, Graversen then redesigned the depth gauge on his extended pitch chain. He removed the guard portion on the drive link and then reshaped the depth gauge by sloping it rearwardly from the base up to a point rear of the front rivet opening. Tests showed the chain to cut faster than the standard ¼ inch chain. It also exhibited virtually no kickback. Marketing under the name "91" began in the fall of 1974.

Graversen first applied for a patent on the chain in September of 1973. This application contained six claims. Believing it to read on prior art, 35 U.S.C. § 102, the examiner rejected the initial application. Claims 1–5 were dropped, a new one, 7, was added, and Graversen sought reconsideration. In October, 1974, the examiner again rejected the claims. A new amendment was sought, but this was rejected for procedural reasons. The original application was then abandoned and a new application, Serial No. 565,150, was filed. This new application, containing four claims, was allowed and the patent issued on December 30, 1975.[3]

Claim 1, an independent claim, describes a cutter link with a low profile (low cutter height relative to the length of the base portion), and a pivot point located at the most rearward part of the base portion. Claim 2 is dependent on claim 1 and describes a rearwardly sloping depth gauge extending from the base portion to a peak behind the center of the front rivet hole. Claim 3 is dependent on claims 1 and 2 and describes a cutting link with the cutting edge located to the rear of a vertical line bisecting the distance between the front and rear rivet holes. Claim 4 is independent. It incorporates features similar to the preceding claims. It calls for a sloping depth gauge with a peak rearward of the front rivet hole, a cutting link with an extended pitch relative to the pitch of the drive link, and a cutting edge rearward of

---

**2.** See Footnote 1. The pitch of this chain would be the average distance between the center of the two rivet holes on the cutting link (C) and the first rivet hole of the tie strap (B).

**3.** See Appendix A for a reproduction of the Graversen patent.

the line bisecting the two cutting link rivet holes.

Appellant quickly recognized the utility of the Omark design. From the fall of 1974 to February 1978, Homelite and Terry, two Textron subsidiaries, purchased approximately 650,000 feet of the chain. In 1974, Textron began testing the Omark chain in the hope of developing its own extended pitch economy chain. Eventually, the accused chain, the Pro-Cut 375, was developed and marketed.[4]

There is no dispute that most of the attributes of the patented device appear on the Pro-Cut 375. Both have an extended pitch, a low profile, a rearward sloping depth gauge with a peak located behind the center of the front rivet hole, and a cutting edge located behind a point bisecting the rivet holes. Two differences in dimension exist and these form much of the basis for Textron's appeal. First, the location of the pivot point is not at the most rearward place on the base of the cutting link as called for in claim 1. Second, the peak of the depth gauge is not located behind the front rivet hole opening as claim 4 seems to require.

Prior to trial, Omark filed a disclaimer of claim 1 in the Patent Office and thereby restricted its claim of infringement at trial to claims 2, 3, and 4. Apparently, the disclaimer was filed in the belief that claim 1 read on prior art. Claim 1 remains significant, however, because claims 2 and 3 are dependent on it.

## II. DISCUSSION

There are two broad issues presented on appeal. The first involves the validity of the patent. Textron claims that based on the prior art, the patent is invalid for obviousness. It also asserts that the patent is invalid because of inadequate specification. The second issue concerns whether the accused device infringes on the patent. In this context, Textron argues that its saw chain is not the equivalent of the subject chain. Furthermore, it asserts that the doctrine of file wrapper estoppel precludes a finding of equivalence.

At the outset, Textron claims that the trial judge improperly construed the patented device. Textron asserts that the judge analyzed the patent in terms of its commercial embodiment rather than on the claims as written. *See Magnavox Co. v. Hart & Reno*, 73 F.2d 433, 445–446 (9th Cir. 1934). Textron fails, however, to point to any place in the record which shows the trial court construed the patent only in terms of the commercial embodiment. There is also no showing that the production version of the patent, the 91 saw chain, falls outside the claims of the patent. Textron's contention in this respect does not merit further consideration.

### A. Validity

### 1. The Presumption of Validity

■ All patents are presumed valid. 35 U.S.C. § 282. This presumption can be overcome only by clear and convincing evidence. *Speed Shore Corp. v. Denda*, 605 F.2d 469, 471 (9th Cir. 1979); *Santa Fe-Pomeroy, Inc. v. P & Z Co.*, 569 F.2d 1084, 1091 (9th Cir. 1978).

■ Textron contends that the presumption in favor of the validity of the Graversen patent was lost because of the failure of the patent examiner to consider several relevant prior art references. The trial court made a detailed factual inquiry into the prior art and found that none of the references cited by Textron were more pertinent than those cited by the Patent Office. As observed by this court, " '[a]lleged art that is cumulative to cited art does not weaken or destroy the presumption of validity' .... And the presumption is further strengthened on appeal where, as here, the trial court conducted an independent examination of the pertinent prior art and concluded that the patent was validly issued." *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 1271 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976) (citations omitted).

---

4. See Appendix B for a reproduction of the accused saw chain.

The ultimate issue of patent validity is a question of law. But, the factual findings necessary to the determination of validity are binding on appeal unless clearly erroneous. *Speed Shore, supra,* 605 F.2d at 471. The trial judge heard substantial evidence on the prior art cited by the Patent Office. He heard evidence on the prior art references cited by Textron. He concluded the prior art cited by Textron was not relevant because it did not address itself to the solution of the problem of the invention. *Eibel Process Co. v. Minn. & Ont. Paper Co.,* 261 U.S. 45, 67-68, 43 S.Ct. 322, 329–30, 67 L.Ed. 523 (1923); *Bianchi v. Barili,* 168 F.2d 793, 796 (9th Cir. 1948). The trial judge's findings are not clearly erroneous.

2. Inadequate Specification Under 35 U.S.C. § 112

Textron contends claims 2 and 3 are invalid because there are elements of these claims that are not found in the written specification. 35 U.S.C. § 112 states in pertinent part:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

This court has recognized, however, that the "[a]bsence of a description in the specification is not, by itself, fatal to the patentability of an invention." *Speed Shore, supra,* 605 F.2d at 473. Resort may be made to the drawings to cure omissions in the description. *Id.; see Hensley Equipment Co. v. Esco Corp.,* 375 F.2d 432, 435 (9th Cir. 1967). Appellant's own expert testified that one skilled in the art could, by using the drawings and the specification, cure any deficiencies in the written description. (Testimony of Neumeier, Reporter's Transcript, Volume II, at 345–348). We find no error in the district court's holding that the patent in suit meets the requirements of 35 U.S.C. § 112.

3. Obviousness

Textron's primary argument for invalidating the Graversen patent is 35 U.S.C. § 103. Section 103 provides that a device is not patentable:

"if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The Supreme Court has held that a determination of obviousness requires a three-part factual inquiry: (1) the scope and the content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Secondary considerations such as the commercial success of the patented subject, the failure of others to solve the problem, and long felt, but unresolved, needs in the subject area are also relevant. *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–94.

A related issue is whether, as Textron argues, the Graversen patent is merely a combination of elements previously known in the prior art. If so, this court will rigidly scrutinize the patent and impose the additional requirement that the combination must have produced unusual or surprising consequences at the time it was made in order to be non-obvious. *M–C Industries v. Precision Dynamics Corp.,* 634 F.2d 1211, 1214 (9th Cir. 1980); *Photo Electronics Corp. v. England,* 581 F.2d 772, 775 (9th Cir. 1978). This requirement "is not inconsistent with, but merely in application of, the general rule stated in § 103. . . ." *NDM Corp. v. Hayes Products, Inc.,* 641 F.2d 1274, 1280 (9th Cir.), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), quoting *Reeves Instrument Corp. v. Beckman Industries Inc.,* 444 F.2d 263, 271 (9th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). The rationale of this more stringent test is that non-obviousness is less likely to occur in combination

patents which are simply amalgams of old elements. *NDM, supra,* 641 F.2d at 1280. The factual findings underlying the obviousness determination are reviewed under Rule 52(a)'s clearly erroneous standard.

### (a) Claims 2 and 3

Textron contends that the scope and content of the prior art made the Graversen invention obvious. In particular, Textron argues that the prior art disclosed the use of a rearwardly sloping depth gauge. As noted earlier, the trial judge analyzed the prior art in detail. He found that although some of the individual elements of the combination called for by claims 2 and 3 could be found in the prior art, the combination itself was not obvious. In this respect, the trial judge correctly recognized that 35 U.S.C. § 103 directs the inquiry of obviousness to focus on the " 'subject matter as a whole' and not [on] the elements of a claimed combination and their individual novelty." *Reeves Instrument, supra,* 444 F.2d at 270. Textron's attempt to limit the inquiry to individual elements of the patented structure is, therefore, improper. In addition, only two prior art references sought to eliminate kickback by attempting to prevent the depth gauge from engaging an object. One of these references utilized a separate guard link to prevent the problem. The other, commonly called the "chicken beak" chain, had a depth gauge that projected forwardly over the end of the preceding link. It did not prevent kickback and in fact exacerbated the phenomenon.

Textron next asserts that any differences between claims 2 and 3 and the prior art are negligible. In doing so, it points to an example of prior art, the "chamfer chain," which is said to contain the limitations imposed by claims 2 and 3.[5] But again, Textron limits its argument to particular elements of the patent and not to the combination as a whole.

An analysis of the scope of the prior art and the differences between the prior art and the patent does not end the inquiry. The key determination is whether, as evinced by the prior art, the level of ordinary skill in the art was such that the combination of elements in the Graversen design was obvious. This determination is guided by an inquiry into "the problem allegedly solved by the invention and the efforts of others to arrive at a satisfactory solution." *Reeves Instrument, supra,* 444 F.2d at 271. The problem allegedly solved was kickback, a vexing problem with often harmful results. Testimony established that the Graversen invention substantially reduced, if not totally eliminated, the tendency of a saw to kick back. Others in the industry had not achieved such results. Witnesses testified that it was believed that the use of a guard link was the best way to minimize kickback. Guard links did not, however, reduce kickback to the same extent as Graversen's saw chain. Also, those devices lowered the saw's efficiency and increased costs. That the level of skill in the art was not such that Graversen's invention was obvious is best summed up by the statement of Mr. Bailey, a saw chain designer and witness for Omark, who testified "if we thought we could have done it, we would have done it." (Reporter's Transcript, Volume II at 249.)

Secondary considerations strongly support the finding of non-obviousness. The patent was immediately a commercial success. *Graham, supra,* 383 U.S. at 18, 86 S.Ct. at 694. The extended pitch design of the patent was adopted by a number of other chain manufacturers. The chain design also helped resolve a long felt need, the elimination of kickback. *Id.*

At this point, we must return to the question whether the Graversen patent merely entails a combination of old elements. The trial court held first that the patent achieved unusual results, and second

---

**5.** The chamfer chain (Atkins ½ Inch Pitch Cutter), while having a rearwardly inclined depth gauge, also has a substantially vertical leading edge on its depth gauge. It would not alleviate a saw's tendency to kick back. The chamfer chain's other attributes do not fall within the essential patent elements.

that such a finding was unnecessary because the combination involved a new element. *See, e.g., Austin v. Marco Dental Products, Inc.,* 560 F.2d 966, 972 (9th Cir. 1977), *cert. denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978). We agree with the district court's finding that the Graversen invention had unusual and surprising consequences and, therefore, it is unnecessary to determine whether it actually incorporated new elements. It is sufficient that claims 2 and 3 present a novel combination of interdependent elements which create a less costly device that is also safe and efficient. This determination is guided by *Graham's* three-part inquiry and there is no need to recite what was said previously. The trial judge heard and weighed evidence which tended to establish that the Graversen saw chain reduced kickback to such a level it was virtually nonexistent. The trial judge accepted that evidence. His finding is not clearly erroneous. We have little difficulty, then, in concluding that the reduction or elimination of kickback was a "new" result. It simply had not occurred before. Nor is it hard to agree that the result was unusual. Graversen combined several elements in an effort to produce a lower cost saw chain. He acquired, in addition, a chain which was also efficient and safe.

### (b) Claim 4

Claim 4, being independent, must be separately analyzed. It is composed of three primary elements, the foremost calling for a rearward sloping depth gauge. Importantly, claim 4 is not limited to a low profile cutting link as are claims 2 and 3. Much of what was said with respect to the obviousness of claims 2 and 3 applies to claim 4. For the following reasons, we affirm the district court's holding that claim 4 is not invalidated because of obviousness.

██ First, the prior art as analyzed by the trial court did not disclose a cutting link of the same configuration as that in claim 4. It is true, as Textron asserts, the prior art did include cutting links with depth gauges that slope rearwardly. However, a comparison of these links shows they curved downward to a substantially vertical leading edge. The term "sloping" could have been better defined in the claim. Resort may be had, however, to the drawings in order to interpret a claim. *Del Mar Engineering Laboratories v. Physio-Tronics, Inc.,* 642 F.2d 1167, 1172 (9th Cir. 1981). The drawings accompanying the Graversen patent exhibit a depth gauge without a leading edge that is substantially vertical.

██ The level of skill in the art at the time of the Graversen invention taught that safety or guard links were necessary to reduce kickback. Graversen eliminated those devices from his safety chain. This was an aberration from industry practice. Textron argues that it was a simple and obvious step from using a guard link to using a contoured depth gauge such as that adopted by Graversen. But, a patent will not be invalidated simply because "it embodies a solution which seems simple and obvious with the benefit of hindsight." *Saf-Gard Products, supra,* 532 F.2d at 1272; *Palmer v. Orthokinetics, Inc.,* 611 F.2d 316, 323 (9th Cir. 1980). We cannot say, then, the district court clearly erred in its factual findings supporting the conclusion that the combination of elements in claim 4 was non-obvious.

██ We also conclude the combination of elements in claim 4 produced an unusual and surprising result—the virtual elimination of kickback. As noted earlier, no other saw chain had been able to solve this problem. Graversen discovered the utility of his depth gauge design after modifying a standard chain. It was his hope to reduce costs and maintain efficiency. By eliminating the guard link, however, he also reduced kickback substantially. It is important to recognize that Graversen's saw chain was designed for use on consumer chain saws. Chain saws are inherently dangerous devices. That dangerous proclivity is exacerbated when the saw is placed in the hands of one with little or no training in its use. By developing a chain which greatly reduced the danger to consumers while at the same time lowering costs, Graversen creat-

ed an invention with not only unusual results, but also highly beneficial ones.

That this court will closely scrutinize combinations does not mean the patent's presumption of validity is vitiated. In this respect, Textron has a heavy burden and it must rebut the presumption by clear and convincing evidence. *Speed Shore, supra,* 605 F.2d at 471. Based on the foregoing analysis, we cannot say Textron met its burden. *See Smith International, Inc. v. Hughes Tool Co.,* 664 F.2d 1373 (9th Cir.), cert. denied, · — · U.S. ——, 102 S.Ct. 2242, 72 L.Ed. 851 (1982).

### B. Infringement

The trial court held Textron's Pro-Cut 375 saw chain infringed on claims 2, 3, and 4. As we find this holding of the trial court to be supported by the evidence and a proper application of the law, we affirm it as well.

 The district court's finding of infringement was based on an application of the doctrine of equivalents. Generally, to determine whether there is an infringement the court must at the outset look to the words of the claim. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). Even if the accused device does not read literally on the claim, an infringement may still be found under the doctrine of equivalents if the "two devices do the same work in substantially the same way, and accomplish substantially the same result...." *Graver,* 339 U.S. at 608, 70 S.Ct. at 856. In making this determination, "the court must look at the similar device in the context of the patent, the prior art, and the particular circumstances of each case." *Wilden Pump & Eng. Co. v. Pressed & Welded Products Co.,* 655 F.2d 984, 987 (9th Cir. 1981). The court should also consider whether persons reasonably skilled in the art would have known of the interchangeability of the devices. *Graver, supra,* 339 U.S. at 609, 70 S.Ct. at 856. Generally, a finding of infringement is a question of fact

and binding on appeal unless clearly erroneous. *See CS&M, Inc. v. Covington Bros. Technologies,* 678 F.2d 118 (9th Cir. 1982). Here, however, there is no dispute as to the construction of the accused and patented devices. In such a situation, the determination of infringement can be treated as a question of law. *Id.* Nonetheless, our determination of infringement should still be guided by the trial court's underlying findings of fact which are supported in the record. Our review will entail ascertaining whether the trial court applied the correct rule of law to those facts.

At the outset, Textron contends that the district court improperly placed the burden of proof regarding equivalency on it (Textron) rather than on Omark. The trial court made no express statement with respect to the burden of proof. We can discern no error, however, where both parties offered evidence from their respective experts regarding the design and function of the saw chains in question. Clearly, there was sufficient evidence presented by Omark to raise at least an inference that the devices in issue were equivalent. Textron's contention is, therefore, without merit.

Textron does not dispute that at least one part of the equivalents test has been met. It readily concedes that the accused saw chain achieves the same results as the patented device—increased efficiency and a minimization of the danger of kickback. It argues, however, that its chain does not use the same means in the same way as the patented chain in order to achieve the like results. *Mobil Oil Corp. v. Filtrol Corp.,* 501 F.2d 282, 292 (9th Cir. 1974).

Textron stipulated at trial that the only issue with respect to the infringement of claims 2 and 3 involved the location of the pivot point on the cutting link. Textron argues that because the pivot point on the accused saw chain is not located at the rearward most part of the cutting link base, the same design or "means" is not used to accomplish the like result.[6] This argument

---

6. The cutting link on the Pro-Cut 375 has a bulge at the rearward part of the base. This attribute places the pivot point slightly forward of the most rearward portion of the base as

improperly focuses on the elements of the patent claims in isolation rather than as an interdependent whole. Also, the testimony established and the trial court found the design of the rearward section of the Pro-Cut 375, including its pivot point location, served no functional purpose. The effect of that finding is the pivot point is in substantially the same *functional* location in both saw chains. The trial court did not err in holding that the Pro-Cut 375 design was the equivalent of claims 2 and 3.

Textron also stipulated at trial that the only infringement issue with respect to claim 4 was the location of the peak of the depth gauge. Claim 4 teaches, among other things, that the peak of the depth gauge be rearward of the front rivet opening of the cutting link. The accused chain has a depth gauge peak located to the rear of the center of the rivet hole, but not behind the rivet hole itself. The trial court held the accused chain was the equivalent of the patented device. We can discern no error. The trial judge could properly find that among the several interdependent elements of claim 4, and in particular the requirement that the depth gauge be rearwardly sloping, the exact location of the peak of the depth gauge was not of primary importance. *See International Manufacturing Co. v. Landon, Inc.,* 336 F.2d 723, 727–728 (9th Cir. 1964), *cert. denied,* 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965).

Textron also contends the accused chain is not the equivalent of the subject chain because a different attribute, that of a lower depth gauge setting than used in the patented device, results in the elimination of kickback. In this respect, Textron asserts that it is not the attributes claimed in the patent and found on its device, such as an extended pitch, a sloping depth gauge, a low profile, a rearward pivot point, etc., which minimize kickback. In fact, the evi-

dence presented supports the conclusion that a lower depth gauge setting can reduce kickback. The patented device, however, uses a higher setting and still exhibits the same minimum tendency to kickback. The trial court could properly hold, then, that a lower depth gauge setting is insufficient to differentiate the accused saw chain. Instead, it is the similar features which lead to the similar results of greater efficiency and less kickback.[7]

■ The final issue concerning infringement is whether, as Textron contends, the doctrine of file wrapper estoppel precludes a finding that the accused chain reads on claims 2 and 3 of the subject chain. Under this rule of construction, an applicant who has surrendered, amended, narrowed, or otherwise limited his claims in order to secure the allowance of a patent may not later recapture through the doctrine of equivalents what he has given up. *Graham, supra,* 383 U.S. at 33, 86 S.Ct. at 701–02; *International Manufacturing Co., supra,* 336 F.2d at 727.

■ As noted, Textron stipulated at trial that the only issue with respect to the infringement of claims 2 and 3 was whether the accused chain has a pivot point located at the rearward most point of the base portion of the cutting link. The issue can be narrowed, then, to whether file wrapper estoppel precludes a finding of equivalence because of the different dimensional location of the pivot point in the Pro-Cut 375.

The original claims of the application were rejected because the combination presented was, *as a whole,* unpatentable over the references cited. The district court found the requirement that the pivot point be located at the most rearward part of the base of the cutter was unnecessary to distinguish the claim over the prior art cit-

called for in claim 1. As noted earlier, claims 2 and 3 are dependent on claim 1 and all three must be read as a whole.

7. Hille, a witness for Omark, testified that a lower depth gauge setting can reduce kickback. He stated further, however, he would expect the lower setting in the Pro-Cut chain to result

in only "slightly less kickback." (Reporter's Transcript, Volume III at 205.) In addition, Textron stipulated that the locations of the pivot point and the peak of the depth gauge were the only issues with respect to infringement of the patent. The height of the depth gauge was not in issue.

ed in rejection of the earlier claims. Thus, Omark is not recapturing something it had given up to secure issuance of the patent. *International Manufacturing Co., supra,* 336 F.2d at 727. Nor should the patent be strictly limited to cover only those structures having a pivot point located at the most rearward point in the base. "[A]n applicant should not be presumed to have made a disclaimer broader than necessary to yield to the actual challenge of the claim." *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858, 871 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973); *see Nationwide Chemical Corp. v. Wright,* 584 F.2d 714, 719–720 (5th Cir. 1978). Furthermore, the amendment to the original claims contained a combination of elements. The exact location of the pivot point was not the "heart" of the invention but only part of that combination. We cannot say, therefore, that finding file wrapper estoppel inapplicable was either clearly erroneous or a misapplication of the law. *International Manufacturing Co., supra,* 336 F.2d at 727–728.

## III. CONCLUSION

The judgment of the district court holding U.S. Patent No. 3,929,049 valid and infringed is

AFFIRMED.

# United States Patent [19]

**Graversen**

[11] 3,929,049

[45] Dec. 30, 1975

[54] **EXTENDED PITCH SAW CHAIN**

[75] Inventor: Curtis L. Graversen, Milwaukie, Oreg.

[73] Assignee: Omark Industries, Inc., Portland, Oreg.

[22] Filed: Apr. 4, 1975

[21] Appl. No.: 565,150

**Related U.S. Application Data**

[63] Continuation of Ser. No. 398,143, Sept. 17, 1973, abandoned.

[52] U.S. Cl. .......................................... 83/834; 83/833
[51] -Int. Cl.² ........................................... B27B 33/14
[58] Field of Search .................................. 83/833, 834

[56] **References Cited**
**UNITED STATES PATENTS**

| 2,744,548 | 5/1956 | Stephenson et al | 83/834 |
| 2,913,023 | 11/1959 | Hazzard | 83/834 |
| 2,924,254 | 2/1960 | Smith | 83/834 |
| 3,283,789 | 11/1966 | Silvon | 83/834 |
| 3,308,859 | 3/1967 | Ehlen | 83/834 |

*Primary Examiner*—Donald R. Schran

[57] **ABSTRACT**

A cutter link for a saw chain including an elongated base having front and rear ends and upper and lower edges. Rivet holes are provided adjacent each end. A cutting portion extends upwardly from the upper edge on the rearward half of the base. A depth gauge extends from the upper edge on the forward half of the base. Said depth gauge terminates at a peak located rearward of the center of the front rivet hole and is spaced from the cutting edge of the cutting portion to provide a gullet. The depth gauge has a leading edge that is inclined rearwardly from the front of the base to the peak. The height of the combined base and cutting portion is no greater than the distance between the centers of the rivet holes plus 10 percent.

4 Claims, 3 Drawing Figures

FIG.1

FIG.2

FIG.3

3,929,049

1

### EXTENDED PITCH SAW CHAIN

This is a continuation of application United States Ser. No. 398,143, filed Sept. 17, 1973, now abandoned.

This invention relates to an improved saw chain for felling timber and the like and more particularly to a new cutting link configuration.

Saw chain for which the present invention is applicable includes a series of pivotally connected links (pivotally connected by rivets). This series includes center links and side links, the center links having drive tangs and, more commonly, certain of the side links, alternating from one side to the other, having cutting portions extended opposite from the drive tangs. The cutting portions are of the hooded type, i.e., with a side plate and top plate joined by an integral corner, with the top plate extending over the center links. There is a continuous leading edge formed by the top plate, corner, and adjacent portion of the side plate that is sharpened into a cutting edge.

Whereas improvements have been made in chain saws to enable them to be made smaller, and because of the desirability in the market for smaller, easier handling, less expensive and faster cutting chain saws, saw chain has been required by the chain saw industry to be made smaller. The configuration of the cutting link of the saw chain has been designed over the years largely by trial and error. Thus, the configuration that has come to be standard in the industry is considered most suited for satisfying preference of chip size and clearance, endurance of cutters, ease of sharpening and manufacturing, etc. Thus, as the size of the saw chain was reduced, the configuration of the cutting link was maintained. The pitch of the saw chain is the average distance between the rivets. As pitch increased or decreased, so did all other dimensions. Because pitch is important to match saw chain to drive sprockets, pitch became the term used to measure saw chain size. Thus, whereas a number of years ago a popular sized saw chain for hand chain saws was ¾ inch pitch chain, this was reduced down in stages, e.g. to ⅝ inch pitch chain, ½ inch pitch chain, ⅜ inch pitch chain and more recently to ¼ inch pitch chain. This reduction in pitch has had a number of effects. A most significant effect is the increased number of parts required for the same length of chain. A foot of ¼ inch pitch chain includes many more parts than even a ⅜ inch pitch chain and the cost of making the smaller chains has, accordingly, increased.

It is an object of the present invention to produce smaller size chain while maintaining a larger pitch and fewer saw chain components. It is a further object to increase stability of the chain and greater safety while maintaining or improving cutting efficiency.

Very briefly, in the preferred embodiment of the present invention, the cutting portion of the cutting link is reduced relative (rather than proportional) to the pitch. This reduction reduces the height of the cutting portion which requires reduction in the height of the depth gauge. Thus, for example, the cutting portion is similar to a one-quarter inch pitch chain while all other characteristics (except the depth gauge) simulate a three-eighths inch pitch chain. It has been found that the reduced cutting portion size and depth gauge height produces a lower profile satisfying the need for "smaller" size chain and yet because the links are as long as larger chain sizes the number of parts per foot of chain are the same as these larger sized chains.

2

Chip size, chip clearance, power requirements, etc. are the same as obtained by, e.g. conventional one-quarter inch pitch chain.

It will be understood that reducing the cutting portion reduces both its height and length. Previously, a saw chain acceptable to the market required that the cutting portion extend over the maximum length of the base of the link from which the cutting portion and depth gauge extend. Thus the depth gauge was typically extended vertically from the front edge of the base, followed by a gullet (clearance for chips and to permit filing the cutting edge) and the remainder was taken up by the cutting portion. With the reduction in length of the cutting portion (relative to the base), the leading cutting edge can be moved rearwardly on the base and the peak of the depth gauge can similarly be moved rearwardly. The depth gauge can then be inclined rearward and the inclination of the leading edge produces the very desirable effect of reducing kick back, a recognized hazard in chain saw cutting.

Still further, the lower profile of the cutting portion on the longer base improves the leverage action to inhibit rearing of the cutter (backward pivoting of the cutting link about its rearward most contact with the guide bar) so as to produce a more stable cutting performance resulting in reduced vibration, reduced wearing of chain saw parts, reduced wearing of the saw chain and more rapid cutting performance.

Having thus briefly described the preferred embodiment of the present invention and its advantages, a more thorough understanding will be acquired by reference to the following detailed description and drawings wherein:

FIG. 1 is a side view of a length of saw chain incorporating the present invention;

FIG. 2 is a top view of the chain shown in FIG. 1; and

FIG. 3 is a side view of the cutting link of the chain shown in FIG. 1 and a conventional cutting link shown in dotted lines overlaying the cutting link of the invention.

Referring to FIGS. 1 and 2 of the drawings, a length of saw chain incorporating the present invention includes center drive links 10 pivotally interconnected by rivets 12 to pairs of side links. Certain of said side links being tie straps 14 and others being cutting links 16. The cutting links 16 are comprised of a base 18 (corresponding to the configuration of the tie straps 14) from which a cutting portion 20 extends from the rear of the base 18 and a depth gauge portion 22 extends from the front of the base. As particularly seen from FIG. 2, the cutting portion 20 includes a side plate 20-s and a top plate 20-t. The leading continuous edge of the top plate, corner joining the top plate and side plate, and adjacent portion of the side plate are sharpened to provide a cutting edge 24.

It is to be understood that the reference numerals 18, 20, 22 and 24 of FIG. 1 are applicable to the corresponding parts of the saw chain cutting link illustrated in solid lines in FIG. 3. They have been deleted from FIG. 3 to provide greater clarity. Referring to the dotted overlay of FIG. 3 illustrating a conventional cutting link, the height $h_1$ is typically greater than the distance $d$ between the rivet holes (center to center) by about 25 percent or more. Hereafter the distance d between centers of the rivet holes in the cutting link is referred to as cutting link pitch. Also reference to the cutting link height refers to the combined height of the base and cutting portion, the lower end of the base being

# 1256

measured from an imaginary line extending along the bottom edge of the tie straps. (When the cutting portion resides on a center link, the portion of the driving tang below the imaginary line is not considered in determining cutting link height.) The length $L_1$ of the cutting portion (when new) is such as to preferably locate the cutting edge forward of the center line $c$ (mid-point between the rivets). The gullet 30 represents the acceptable spacing between the cutting edge and the depth gauge and as will be noted results in locating the peak of the depth gauge (that outermost portion that functions to limit the cutting depth) vertically above the front rivet. The rivets are located as close as practical to the front and rear edges of the cutting link as excessive overhang produces undesired pivoting of these overhanding portions, e.g. as the chain travels around the ends of the guide bar.

Referring now to the solid line illustration in FIG. 3. Whereas the conventional cutting link height is substantially greater than the cutting link pitch, the improved cutting link of the present invention has a height at least no greater than the cutting link pitch plus 10 percent and preferably no greater than the cutting link pitch. The length $L_2$ of the cutting portion (in this preferred embodiment) places the leading edge of the cutting portion rearward of the center line c. The peak of the depth gauge portion is rearward of the center of the front rivet hole and preferably rearward of the hole, and the leading edge of the depth gauge is inclined rearwardly from the top front edge of the base to the peak. Thus, the new configuration permits the peak to be located rearward of the front edge of the cutting link by a distance more than half the cutting link pitch whereas the depth gauge of the prior cutting links were substantially less than half this cutting link pitch. With the reduced height of the depth gauge (as measured from the top of the base), the ratio of the height of the depth gauge peak $K_2$ to the distance it is located rearward of the front edge $E_2$ is in the order of 2 to 3 while this same ratio on conventional chain, i.e., $K_1$ to $E_1$, is in the order of 3 to 2. The degree of incline available is substantially improved and the safety factor for the new chain is thus increased many fold. ·

Increased stability is also achieved by reason of the reduced moment arm of the cutting force measured as the forces $F_1$ and $F_2$ acting against the respective cutting edges creating a pivoting action about pivot P, the rearmost point of the cutting link engaging the guide bar. Thus, the improved chain has greater resistance to rearing back producing greater stability, less vibration, improved wearing, etc.

Having described basically the novel features of the improved saw chain, a specific example of a saw chain incorporating the concepts of the invention is set out below.

## EXAMPLE

A saw chain of the present invention having a cutting portion simulating a one-quarter inch pitch chain and a base simulating a three-eighths inch pitch was designed as follows:

The cutting link pitch was determined to be 0.390 inch, equal to "OREGON 72D" brand saw chain having a chain pitch of ⅜ inch (i.e., ⅜ inch as an average pitch with the pitch of the drive link being approximately 0.350 inch). The overall length of the cutting link was determined by a ) determining minimum size aperture or opening for the rivets, and b) providing sufficient material around the rivet opening to satisfy minimum strength and wearing requirements. (The material thickness was 0.042 inch.) For the present chain, the rivet opening was calculated to have a diameter of 0.105 inch and the minimum depth of material around the opening was calculated to be 0.060 inch. It was further determined, however, that the depth of material at each end could be advantageously extended to 0.081 inch and thus the total length was established as $0.390 + 0.105 + 2 \times 0.081 = 0.657$. The minimum height for the base equals 0.105 inch + 2 × 0.060 = 0.225 inch.

The configuration of the depth gauge was then determined. The height of the chain at the cutting portion above the base equals 0.149 inch (simulating the cutting portion of ¼ inch pitch chain). The depth gauge is preferably set 0.025 inch below the cutting edge and thus the height of the depth gauge above the base was calculated to be 0.149 – 0.025 = 0.124 inch. The depth gauge length, i.e., from the peak forward to the front edge of the base (with the peak just rearward of the pivot hole), is 0.105 + 0.081 or 0.186 inch rearward of the front edge of the base leaving adequate room for the gullet and cutting portion. The gullet is 0.175 inch leaving 0.295 for the cutting portion. It will be noted that the height of the depth gauge to its length has a ratio of approximately 2 to 3 to provide for a shallow inclination.

Whereas the preferred embodiment of the invention has been specifically described in the foregoing, it will be understood that numerous variations and modifications will become apparent to those skilled in the art without departing from the invention as defined in the claims appended hereto.

What is claimed is:

1. A saw chain comprised of pivotally connected center drive links and guide bar engaging side links, certain of said guide bar engaging side links being cutting links, said cutting links having a base portion from which is extended a leading depth gauge portion and a cutting portion having a leading cutting edge, said base portion of said cutting links having front and rear rivet receiving openings with rivets therethrough pivotally connecting said cutting links to drive links that precede and follow said cutting links, said base portion further having front and rear bar engaging edge portions and said rear bar engaging edge portion providing at its rearward most point a pivot around which the cutting link pivots as the front end of the cutting link is raised in response to a force acting against the cutting edge, said pivot being located rearwardly of the rear rivet opening and the lengthwise distance between said pivot and the front rivet being substantially greater than the vertical distance of the cutting edge above the pivot, and said pivot located at the rearward most point of the base portion.

2. A saw chain as defined in claim 1 wherein the depth gauge portion of the cutting link has a rearwardly inclined leading edge from a point adjacent to its junction with the base portion to the peak of the depth gauge, said peak being located rearward of the center of the front rivet opening.

3. A saw chain as defined in claim 2 wherein the cutting edge of the cutting portion is located rearward of a vertical line bisecting the distance between the front and rear rivet openings.

4. A saw chain comprised of pivotally connected center drive links and guide bar engaging side links,

3,929,049

certain of said guide bar engaging side links being cutting links, said cutting links having a base portion from which is extended a leading depth gauge portion and a cutting portion having a leading cutting edge, said base portion of said cutting links having front and rear rivet receiving openings with rivets therethrough pivotally connecting said cutting links to drive links that precede and follow said cutting links, an imaginary line joining the centers of the front and rear rivet openings said cutting links and said leading cutting edge being rearward of a plane perpendicular to and bisecting said imaginary line, said depth gauge having its peak located rearward of the front rivet opening and sloping downwardly toward the leading front edge of cutting link and said drive links having front and rear rivet openings spaced apart a distance substantially less than the spacing between the front and rear rivet openings of the cutting links.

* * * * *

UNITED STATES PATENT OFFICE

R. L. HARRINGTON

# CERTIFICATE OF CORRECTION

PATENT NO. : 3,929,049
DATED : December 30, 1975
INVENTOR(S) : Curtis L. Graversen

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

CLAIM 4, Col. 5, line 9, after "openings" insert --of--.
line 10, after "links" insert --,--.

Col. 6, line 4, after "of" insert --said--; and
after "link" insert --,--.

Signed and Sealed this

first Day of June 1976

Attest:

*Ruth C. Mason*
RUTH C. MASON
*Attesting Officer*

C. MARSHALL DANN
*Commissioner of Patents and Trademarks*

APPENDIX B

Textron's Pro-Cut 375 Saw Chain